## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

LESTER J. WILLIAMS            CIVIL ACTION NO. 6:14-cv-0800
       LA. DOC #493591
VS.                                SECTION P

                                          JUDGE WALTER

WARDEN BURL CAIN          MAGISTRATE JUDGE HANNA

### REPORT AND RECOMMENDATION

Before the court is a petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2254 on April 9, 2014 on behalf of Lester J. Williams.[1] Petitioner is an inmate in the custody of the Louisiana Department of Corrections incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. Petitioner attacks his 2009 conviction for second degree murder of his wife, Cynthia Williams, entered by the Sixteenth Judicial District Court for Iberia Parish, Louisiana, for which petitioner was sentenced to life imprisonment.

This matter has been referred to the undersigned in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the court. For the following reasons, it is recommended that this *habeas corpus* petition be **DENIED AND DISMISSED WITH PREJUDICE**.

---

[1] The petition was originally filed by petitioner in proper person. Counsel subsequently enrolled, and accordingly, filed a supplemental memorandum or alternatively a reply on petitioner's behalf, arguing only those claims which counsel believes merit federal *habeas corpus* relief. [rec. doc. 29].

## STATEMENT OF THE CASE

Petitioner was indicted on a charge of first degree murder on April 24, 2006; the indictment was amended to charge second degree murder on January 7, 2009. [rec. doc. 1-1, pp. 12-13].   Petitioner was convicted of second degree murder on January 27, 2009.  On March 18, 2009, petitioner was sentenced to life imprisonment. [rec. doc. 1, ¶ 1-7].

Petitioner directly appealed to the Louisiana Third Circuit Court of Appeal which affirmed petitioner's conviction on June 1, 2011.  On direct appeal, petitioner argued the following claims for relief:  (1) sufficiency of the evidence; (2) erroneous admission of "other crimes" evidence; (3) the denial of the right to cross-examine the witness when prior statements of the victim were admitted into evidence, and erroneous denial of petitioner's motion for mistrial;  (4) error in limiting closing statements to 90 minutes; and, (5) error in allowing the Coroner to testify as an expert in "bone density."  The Third Circuit declined to reach the merits of petitioner's Fifth Assignment of Error because petitioner did not preserve his right to review that error when he failed to make a contemporaneous objection as required by La. C.Cr.P. art. 841.  *State of Louisiana v. Lester Williams*, 2010-1398, 2011 WL 2149090, 66 So.2d 86  (La. App. 3 Cir. 6/1/2011). [*See also* rec. doc. 1-2, pp. 1-18].

2

Petitioner wrote a letter to the Judicial Administrator of the Louisiana Supreme Court; the letter was dated June 19, 2011, but mailed on June 22, 2011. In the letter petitioner indicated his desire to file an application for writ of certiorari. He explained that although the Third Circuit's opinion was dated June 1, 2011, he had been evacuated from the prison until June 14, 2011 and consequently was not aware of the Third Circuit's judgment until June 15, 2011, the date he "signed and received it" from the prison administration. He then claimed that he was unable to file for a rehearing in the Court of Appeals nor was he "able to properly prepare a Writ Application to this Honorable Supreme Court." He concluded by requesting "a reasonable amount of time in excess of the thirty (30) days afforded by law to file writs . . . ." [rec. doc. 9, p. 4 – Request for Legal Indigent Mail; p. 5, letter to Louisiana Supreme Court].

In a letter dated June 28, 2011, the Clerk of the Louisiana Supreme Court advised petitioner that his pleadings had been assigned Docket Number 2011-KO-1371 and had been received and filed on June 28, 2011. The notice also indicated that the filing was metered on June 23, 2011. [rec. doc. 9, p. 7].  In a letter from the Central Staff of the Supreme Court dated June 30, 2011, and referencing petitioner's letter of June 23, 2011, petitioner was advised that with regard to the proceedings assigned Docket Number 2011-KO-1371, his application could not be

3

evaluated because he failed to provide "the required documentation" including copies of the complained of judgments of the District Court and the Court of Appeals and the mandated Louisiana Writ Application Filing Sheet.  He was further advised, "Your filing and any supplemental application does not represent a finding by the Court that your filings are or are not timely. You should send your documents as soon as you are able, preferably within 60 days from the date of this letter . . . ." [rec. doc. 9, p. 8].

On July 12, 2011 petitioner apparently presented his writ application to prison authorities for mailing to the Louisiana Supreme Court. [rec. doc. 9, p. 6]. The writ application was dated July 8, 2011 and raised the same claims raised on direct  appeal to the Third Circuit.  [rec. doc. 9, pp. 9- 19].  On December 16, 2011, the Louisiana Supreme Court denied writs without comment. *State of Louisiana v. Lester Williams*, 2011-1371, 76 So.3d 1200 (La. 12/16/2011). [*See also* rec doc. 1-2, p. 19].  Petitioner did not seek further direct review in the United States Supreme Court.  [rec. doc. 1, ¶ 9(h)].

On August 2, 2012, petitioner filed a *pro se* application for post-conviction relief in the Sixteenth Judicial District Court .  [ rec. doc. 9, p. 21]. In this Application, petitioner raised the following claims for relief: (1) the State failed to file an amended Bill of Indictment when it charged petitioner with second degree

murder; (2) ineffective assistance of counsel based on counsel's (a) failure to investigate and subpoena records favorable to the defense, (b) failure to hire or consult expert witnesses, (c) failure to challenge the qualifications of the jury, (d) counsel denied petitioner his right to testify, (e) failure to challenge the affidavit in support of the arrest warrant, and, (f) failure to request *voir dire* on the issue of racial prejudice; (3) trial court abused its discretion when it excused potential jurors for hardship reasons; (4) trial court erred in accepting Ricky Eskind as an expert in death investigations; and (5) trial court erred in accepting Dr. Collie Trant as an expert in forensic pathology.  [rec. doc. 9, pp. 22-41].

On September 7, 2012, the trial court directed the State to respond to Claim 1 only. [rec. doc. 1-2, p. 20].

On September 21, 2012, petitioner filed a supplemental application adding a claim that  La. R.S.14:30.1 is unconstitutional  because it requires imposition of a life sentence without benefit of parole. [rec. doc. 9, pp. 50-57].  On October 22, 2012, the trial court denied post-conviction relief based on petitioner's failure to allege a claim, which, if established, would entitle petitioner to relief. [rec. doc. 1-2, p. 21].

On November 15, 2012, petitioner sought writs in the Third Circuit Court of Appeals. [rec. doc. 9, pp. 58-79].  On June 24, 2013, the Third Circuit denied writs

and mailed notice of judgment. The Third Circuit found in pertinent part as

follows:

> The State was not required to make a formal written amendment to
> the indictment to try Relator for second degree murder. *See State v.
> Seals*, 09-1089 (La. App. 5 Cir. 12/29/11), 83 So.3d 285, *writ denied,*
> 12-293 (La. 10/26/12). 99 So.3d 53.  Relator failed to prove trial
> counsel was ineffective. *See* La. Code Crim P. art. 930.2; *State v.
> Celestine*, 11-1403, (La. App. 3 Cir. 5/30/12), 91 So.3d 573; *State v.
> James*, 05-2512 (La. 9/26/09), 938 So.2d 691.  Relator also failed to
> make a showing of fraud or irreparable injury regarding the trial
> court's excusing prospective jurors on the basis of hardship. *State v.
> Young*, 613 So.2d 631 (La. App. 1 Cir. 1992).  In addition, the trial
> court did not abuse its discretion when accepting Ricky Eskind and
> Dr. Collie Trant as experts.

With regard to petitioner's claim concerning the unconstitutionality of the

mandatory life sentence provision of R.S.14:30.1, the Court, citing *State ex rel.*

*Melinie v. State*, 93-1380 (La. 1/12/1996), 665 So.2d 1172, declined to reach the

merits of the claim since sentencing claims may not be raised in post-conviction

proceedings.  [rec. doc. 1-2, p. 27*, State of Louisiana v. Lester Williams*, No.  KH-

12-01345 (La. App. 3rd Cir. 6/24/13)].

On July 18, 2013, petitioner sought writs in the Louisiana Supreme Court.

[rec. doc. 9, pp. 80-103].  On February 21, 2014, the Louisiana Supreme Court

denied  writs without comment.  *State of Louisiana ex rel. Lester Williams*, 2013-

1770 (La. 2/21/2014), 133 So.3d 672. [*See also* rec. doc. 1-2, p. 28].

In the petition before this court petitioner raises the following claims for relief: (1) sufficiency of the evidence; (2) erroneous admission of "other crimes" evidence; (3) the denial of the right to cross-examine the witness when prior statements of the victim were admitted into evidence; (4) error in limiting closing statements to 90 minutes; and, (5) error in allowing the Coroner to testify as an expert in "bone density";  (6) the State failed to file a written amended indictment when it charged petitioner with second degree murder; (7) ineffective assistance of counsel based on counsel's (a) failure to investigate and subpoena records favorable to the defense, (b) failure to hire or consult expert witnesses, (c) failure to challenge the qualifications of the jury, (d) counsel denied petitioner his right to testify, (e) failure to challenge the affidavit in support of the arrest warrant, and, (f) failure to request *voir dire* on the issue of racial prejudice; (8) trial court abused its discretion when it excused potential jurors for hardship reasons; (9) trial court erred in accepting Ricky Eskind as an expert in death investigations; (10) trial court erred in accepting Dr. Collie Trant as an expert in forensic pathology; and (11) that  La. R.S.14:30.1 is unconstitutional  because it requires imposition of a life sentence without benefit of parole.

The State has filed an Answer and Memorandum in Opposition to federal *habeas corpus* relief [rec. doc. 16].  Petitioner's counsel filed a Reply. [rec. doc. 29].  This Report and Recommendation follows.

# LAW AND ANALYSIS

## *Standard of Review*

This *habeas* petition was filed on December 8, 2014; therefore the standard of review is set forth in 28 U.S.C. § 2254(d), as amended in 1996 by the Antiterrorism and Effective Death Penalty Act (AEDPA). *Knox v. Johnson,* 224 F.3d 470, 476 (5th Cir. 2000); *Orman v. Cain,* 228 F.3d 616, 619 (5th Cir. 2000).[2] AEDPA substantially restricts the scope of federal review of state criminal court proceedings in the interests of federalism, comity, and finality of judgments. *Montoya v. Johnson*, 226 F.3d 399, 403-04 (5th Cir. 2000) *citing Teague v. Lane,* 489 U.S. 288, 306, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000)[3] (noting that AEDPA "placed a new restriction on the power of federal courts to grant writs of *habeas corpus* to state prisoners").

Title 28 U.S.C. § 2254(d) as amended, states as follows:

**(d)** An application for a writ of habeas corpus on behalf of a person in

---

[2]Before enactment of AEDPA, "a federal court entertaining a state prisoner's application for *habeas* relief . . . exercise[d] its independent judgment when deciding both questions of constitutional law and mixed constitutional questions (i.e., application of constitutional law to fact). In other words, a federal *habeas* court owed no deference to a state court's resolution of such questions of law or mixed questions." *Montoya ,* 226 F.3d at 403-04 *citing Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000) and 28 U.S.C. S 2254(d) (West 1994).

[3]Justice O'Connor delivered the opinion of the Court with respect to the standard of review, while Justice Stevens delivered the opinion of the Court with respect to other aspects of the opinion which have no bearing on the issues herein.

custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

**(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a  set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) *citing Williams,* 120 S.Ct. at 1523; *Montoya,* 226 F.3d at 403-04 *citing  Williams*, 120 S.Ct. at 1523.  "The 'contrary to' requirement 'refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Dowthitt,* 230 F.3d at 740 *citing Williams*, 120 S.Ct. at 1523.

Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that

principle to the facts of the prisoner's case." *Dowthitt,* 230 F.3d at 741 *citing Williams,* 120 S.Ct. at 1523.  The standard is one of objective reasonableness. *Montoya,* 226 F.3d at 404 *citing Williams,* 120 S.Ct. at 1521-22.  A federal *habeas* court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . [r]ather, that application must also be unreasonable." *Williams,* 120 S.Ct. at 1522.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  *Dowthitt,* 230 F.3d at 741.  Federal *habeas* courts presume such determinations to be correct; however, the petitioner can rebut this presumption by clear and convincing evidence.  *Id.*  Thus, this court must defer to the state court's decision unless it was based on an unreasonable determination of the facts in light of the record of the State court proceeding.  *Id. citing* 28 U.S.C. § 2254(d)(2); *Knox,* 224 F.3d at 476 *citing Chambers v. Johnson,* 218 F.3d 360, 363 (5th Cir. 2000).

In sum, "[a] state court's determination that a claim lacks merit precludes federal *habeas* relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786 (2011). Thus, under § 2254(d), "[a]s a condition for obtaining *habeas corpus* from a federal court, a state prisoner must show that the state

court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-787.  "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 786.

## I. Sufficiency of the Evidence

Petitioner argues that the evidence presented was insufficient to convict him of second degree murder.  More specifically, he argues that there was insufficient evidence to prove that he possessed the specific intent to kill or inflict great bodily harm on his wife.  This contention is based on Williams' argument that his wife's injuries were consistent with his claim that he had been assisting his wife, who had been "violently" ill and vomiting, by carrying her to and from the bathroom, and his attempt to resuscitate her when she became non-responsive by slapping her in the face and tossing her in the bed, not from strangulation or beating.

In rejecting petitioner's sufficiency of the evidence claim on direct appeal the Louisiana Third Circuit Court of Appeal extensively analyzed the evidence presented at trial, and found that the evidence was sufficient to support petitioner's conviction under the federal standard set forth by the United States Supreme Court in *Jackson v. Virginia.   State v. Williams,* 2011 WL 2149090, *1-5 (La. App. 3rd Cir. 2011).

Based on its extensive analysis of the evidence, the Third Circuit expressly

found sufficient evidence to support petitioner's second degree murder conviction,

as follows:

> In the current case, we find that the State met its burden of proof and
> that the finder of fact rejected Defendant's hypothesis of innocence.
> The facts of the case showed that Defendant exhibited a continuous
> conduct of violence against his wife. He was admittedly alone with
> his wife at the time she died, within days of again being convicted of
> domestic abuse and ordered to have no contact with her. The victim's
> body was freshly bruised, particularly in the neck area. It was
> established that the cause of death was manual strangulation.
> Defendant's contention that the bruises were a result of him dragging
> her from the bedroom to the bathroom as she was throwing up does
> not explain the several broken and shattered ribs, which testimony
> established occurred shortly before she died. Defendant's intent to
> inflict at least great bodily harm is exhibited by the severity of the
> injuries. The jury heard extensive testimony regarding whether the
> victim's illness may have been the cause of her death and obviously
> rejected Defendant's hypothesis of innocence.

*Williams*, 2011 WL 2149090 at *5.

The standard for reviewing the sufficiency of the evidence is whether,

viewing the evidence in the light most favorable to the government, *any* rational

trier of fact could have found the essential elements of the crime beyond a

reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2788-89, 61

L.Ed.2d 560 (1979) (emphasis added); *Gibson v. Collins*, 947 F.2d 780, 781 (5th

Cir. 1991) *quoting Jackson*, 443 U.S. at 319.  Thus, a federal court "may find the

evidence sufficient to support a conviction even though the facts also support one

or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson*, 947 F.2d at 783.  Stated differently, an applicant is entitled to *habeas corpus* relief only if it is found that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id. citing Jackson,* 443 U.S. at 324; *West v. Johnson,* 92 F.3d 1385, 1393 (5ᵗʰ Cir. 1996) *citing Jackson*, 443 U.S. at 322-26.

This court applies the *Jackson* standard "giving great weight to the state court's determination." *Gibson*, 947 F.2d at 782, 786; *Porretto v. Stalder*, 834 F.2d 461, 467 (5ᵗʰ Cir. 1987).  Both direct and circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction.  *Schrader v. Whitley*, 904 F.2d 282, 287 (5ᵗʰ Cir. 1990) *citing Jackson*, 443 U.S. at 319, 324-25, 99 S.Ct. at 2789, 2792; *Pate v. Wainwright*, 607 F.2d 669, 670 (5ᵗʰ Cir. 1979) (*per curiam*). The fact that most of the evidence against a defendant was circumstantial does not change the standard of review.  *United States v. Zuniga-Salinas*, 945 F.2d 1302, 1305 (5ᵗʰ Cir. 1991) *citing United States v. Lechuga*, 888 F.2d 1472, 1476 (5ᵗʰ Cir. 1989).

 Contrary to petitioner's position, review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, as those determinations are the exclusive province of the jury.  *United States v. Young*, 107 Fed.Appx. 442, 443 (5ᵗʰ Cir. 2004) *citing United States v.*

*Garcia*, 995 F.2d 556, 561 (5th Cir. 1993); *Garcia*, 995 F.2d at 561 *citing United States v. Greenwood*, 974 F.2d 1449, 1458 (5th Cir. 1992); *Green v. Johnson,* 160 F.3d 1029, 1047 (5th Cir. 1998); *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789 (noting that it is the jury's responsibility to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts."). Accordingly, "whether judges doubt the credibility of a witness, even an accomplice witness cooperating with the government, is beside the point . . . ." *Greenwood*, 974 F.2d at 1458.   All credibility choices and conflicting inferences are to be resolved in favor of the verdict.  *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) *citing Cyprian*, 197 F.3d at 740.  The reviewing court is not authorized to substitute its interpretation of the evidence for that of the fact finder. *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).

Second Degree Murder is defined in La.R.S. 14:30.1(A) as "the killing of a human being when the defendant had a specific intent to kill or to inflict great bodily harm"  La. R.S. 14:30.1(A)(1).

Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act. . . . ." La.R.S. 14:10(1); *State v. Brooks*, 839 So.2d 1075, 1079 (La. App. 2d Cir. 2003) *citing State v. Lindsey*, 543 So.2d 886 (La. 1989).  Since specific intent is a state of mind, it need not be proved directly but

14

may be inferred from the circumstances of the transaction and the actions of the defendant.  *State v. Graham*, 420 So.2d 1126, 1127 (La. 1982); *State v. Broaden*, 780 So.2d 349, 362 (La. 2001).  Specific intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. *State v. Watson*, 175 So.3d 1192, 1195 (La. App. 3rd Cir. 2015); *State v. Smith,* 166 So.3d 416, 421 (La. App. 2nd Cir. 2015). *See also State v. Draughn*, 950 So.2d 583, 593 (La. 2007)[4]; *State v. Wright*, 834 So.2d 974, 984-985 (La. 2012)[5].

The Third Circuit analyzed the evidence as follows:

On February 20, 2006, about 7:15 p.m., Cheryl Williams, Defendant's niece, arrived home and found Defendant looking for her mother. He told her that his wife, Cynthia, had been sick all day, vomiting. But now she was not breathing. He did not want his niece to call 911 when she offered to call. When Ann Thibodeaux, Defendant's sister, and Ms. Williams' mother arrived home, she called the police.

Ms. Thibodeaux testified that on the morning of February 20, she had run an errand. When she arrived back home, she found that Defendant had left a message on the answering machine: "[G]ood morning, little sister, this me, big brother. I'm just calling, nothing happened, I'm just calling." She found this call to be strange. Ms. Thibodeaux testified that after she called the police that evening, she waited before she went to Defendant's house until she was sure the police would already

---

[4]*Draughn*, 950 So.2d at 593 ("The perpetrator of this crime stabbed or cut Ms. White, a 64-year old woman, in her own home, a total of 61 times. The coroner testified as to her multiple stabbing and cutting injuries and the cause of her death. Specific intent to kill or inflict great bodily harm on Ms. White may be inferred from these circumstances.")

[5]*Wright,* 834 So.2d at 984-985 (victim was brutally beaten innumerable times, blood spatters were on the walls and photographs of the victim showing the severe extent of her multiple injuries sufficient to establish specific intent to kill).

be there.

Darren Denise, a sergeant with the Iberia Parish Sheriff's Office, responded to the call. Defendant met him at the door and told him that the victim had been throwing up all day. He stated that she had stopped breathing about two hours prior to the sergeant's arrival. He told the sergeant that he had gone to his sister's house to tell her about the victim. Sergeant Denise thought this was odd and asked him if his cell phone worked and Defendant told him that it did. The victim was found naked, lying on a bare mattress in the bedroom.

Robert Green, a detective with the Iberia Parish Sheriff's Office, made a DVD of the crime scene and took photographs. The DVD was shown to the jury. He located several blood splatters on doorframes and on the wall in the bathroom and in the bedroom. He collected samples of the blood, which ultimately proved to be the victim's blood.

An investigator from the Iberia Parish Coroner's Office, Ricky Eskind, conducted an initial, external examination of the body at the crime scene. He was qualified by the trial court as an EMT and expert in death investigations. He testified that the body had several "remarkable contusions or bruising." There was a contusion at the corner of her mouth. There was a "blood line at the gum line," bruising and swelling along the left side of the neck at the top of the shoulder, bruising in the pelvic area, and bruising on her upper left arm. There was also some bruising on one of her legs. He testified that most of the bruising was red in color which indicated that they were inflicted within a few hours before she died. He determined that the victim had been dead any time from two to twenty-four hours prior to his examination.

Dr. Collie M. Trant, Iberia Parish Coroner, performed the autopsy on the body of the victim. He testified that the victim had small tears or lacerations on the inside of her lips, as if the lips were compressed or crushed against her teeth. She also had curved, linear abrasions on the skin of her face, which the doctor explained were consistent with

16

fingernails being pressed against her face. Because this type of injury is consistent with strangulation, the doctor conducted an internal examination of the victim's neck and throat. He testified that when the neck was opened, "there were bruises everywhere in the tissues inside. Probably, thirty, maybe fifty, separate bruises scattered through those tissues, several of them being over the carotid arteries." While generally strangulation causes tiny blood vessels in the eyes to break, called petechiae, the eyes of the victim did not display such results. However, strangulation can also cause tiny blood vessels in the skin of the face to break, which was exhibited on the victim's face. The doctor also noted that the hyoid bone in the neck was not broken, which often happens during strangulation.

Further, there were several ribs fractured, two in the front of the victim's body and five in the back, next to the spine. Portions of the ribs were shattered into tiny pieces which had cut through the chest cavity wall. There were also old fractures. The doctor testified the injuries were consistent with a violent blow, more than just falling on the floor—something like stomping. Finally, the doctor found that the victim had a blood/alcohol content of .02 percent, indicating that she had consumed alcoholic beverages at some point shortly before she died. The doctor opined that the cause of the victim's death was manual strangulation.

Jeff Credeur, a detective with the Iberia Parish Sheriff's Office, and Scott Hotard, supervisor of detectives with the Sheriff's Office, investigated and interviewed Defendant the evening of February 20, and again the next day. The two interview sessions were taped. During the interviews, Defendant consistently maintained that the victim had been throwing up all the night before and that day. He told the officers that the victim could not walk and kept falling down. He had to drag her from the bedroom to the bathroom and back several times and had to hold her head over the toilet. He said that he was also sick and appeared to throw up into a wastebasket twice during the first interview. During the interviews, Defendant admitted that he and the victim had been drinking, both hard liquor and beer, and that he had been home alone with her for two days prior to her death.

17

Detective Hotard testified that after the second interview, as he was preparing to have Defendant sent back to jail, Defendant made the statement that he had thrown the victim onto the bed and that she had hit the side of the bed with her chest. He said he had struck her face and then said, "I didn't mean to kill my wife."

The State presented evidence of past physical violence Defendant had committed against the victim, starting in 1999, when he was charged with simple battery and, on December 8, 2000, sentenced to fifteen days in jail.

Jeremy Hatley, a patrol sergeant with the Iberia Parish Sheriff's Office, testified that he responded to a domestic abuse call at Defendant's residence, which resulted in Defendant pleading guilty to domestic abuse battery on January 10, 2004. The sergeant testified he found the victim alone with Defendant, who was in possession of a shotgun. The officer testified that he could see that the victim had been severely beaten around the face. Photographs of the victim were shown to the jury.

Either shortly before or after this incident, Scott Colostio, a lieutenant with the Sheriff's Office, had responded to a domestic abuse call at Defendant's residence and found Defendant in possession of shotgun shells and the victim beaten. On January 16, 2004, Defendant pled guilty to aggravated assault. He was sentenced to one hundred and twenty-five days in jail, with all but forty-seven days suspended. His firearms were forfeited and destroyed.

On December 23, 2004, Defendant was charged with second degree battery of the victim. He was convicted and sentenced to five years at hard labor, suspended, five years supervised probation, and other general and special conditions, including having no contact with the victim.

Jamie Legnon, Defendant's probation officer at this time, testified that on January 6, 2006, Defendant was again charged with domestic abuse battery of the victim. She testified that while Defendant pled

guilty to the offense on February 13, 2006, the trial court did not revoke his probation. Rather, the trial court sentenced him to fifty-six days in jail, with credit for time served, and released Defendant with the provision that he have no contact with the victim and that he live with his mother. The victim's death occurred one week later.

In brief and at trial, Defendant argued that had the police investigated his assertion that the victim had been sick, the evidence would have shown that the injuries received by the victim were a result of Defendant's attempts to help her from bed to bathroom when she had to vomit. He argues that the police made no effort to verify his version of the events by testing spots on the rug and mattress for vomit. He contends that the police made no effort to inform the coroner that the victim had been ill, thus the coroner did not look for an illness or disease that could have killed her when he performed the autopsy. Defendant argues that despite rigorous interrogation by the detectives, he stuck to his contention that the victim was sick and that any injuries perceived on her body were due to him trying to help her.

Both detectives stated that though the victim may have been ill, because the coroner had determined her death was caused by manual strangulation, they did not think the fact that she had been vomiting was relevant evidence.

In brief, Defendant points to his brother's testimony that he had seen Defendant and his wife around noontime on February 17, 2006. The victim appeared to be in good shape and the couple were laughing and joking. He also testified that on the morning of February 20, he and their mother, Pearl Bernard, went to Defendant's house. He said that he knocked several times and called Defendant on his cell phone. When there was no response, they turned to leave, but Defendant appeared at the door and invited them in. They sat at the kitchen table for a few minutes. Defendant told them that the victim was resting, and asked Ms. Bernard to check on her, but they had to rush off, so they never saw the victim that day.

In light of the above, viewing the evidence in the light most favorable to the prosecution as is required by *Jackson* and its progeny, the evidence presented at

19

trial was more than sufficient to sustain petitioner's second degree murder conviction on federal *habeas* review.  Considering  the "great weight" afforded  to the state court's determination and the above summarized evidence, the undersigned finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Although Detective Hotard and Ricky Eskind testified that the victim's injuries were also consistent with petitioner's claim of innocence, and Dr. Trant testified that the victim had no hemorrhaging in the eyes, her hyoid bone was not broken as in most cases of manual strangulation, and that her broken ribs may have been caused by a single event, the jury rejected that testimony.  Instead, the jury credited the testimony of Dr. Trant who, after thoroughly examining the victim, concluded that she had been manually strangled to death and beaten as evidenced by the lacerations on the inside of her lips, linear abrasions on the skin of her face, multiple internal bruises on the victims neck and throat, several of them being over the carotid arteries, and the broken tiny blood vessels in the skin of the victim's face, all of which were consistent with manual strangulation, and the multiple fresh rib fractures, which had cut through the victim's chest cavity wall, consistent with a violent blow or stomping, more than just falling on the floor.  As he did in the Third Circuit on direct appeal, petitioner urges this Court to make credibility determinations, find this testimony of Dr. Trant not credible,

credit Dr. Trant's alternate testimony and that of  Detective Hotard and Ricky Eskind cited above, and accordingly, weigh the evidence in his favor.   However, on a sufficiency of the evidence review, it is not the province of a reviewing court to make credibility determinations or to review the weight of the evidence accepted by the jury.  *See Young, Garcia, Greenwood, Green* and *Jackson*, *supra*.

Although the jury could have rejected Dr. Trant's  testimony regarding the cause of the victim's death, and although the jury could have made contrary inferences from the evidence presented, they chose instead to credit this testimony regarding the cause of the victim's death.   That testimony establishes that the victim's cause of death, manual strangulation, was not due to an accident or failed attempts to assist the victim during her illness as petitioner contends.  This testimony is more than sufficient to establish that a second degree murder occurred by manual strangulation and beating.  Further, there was an abundance of physical evidence to support this testimony that the victim was manually strangled and beaten to death.  This court therefore cannot find Dr. Trant's testimony regarding the cause of the victim's death, which was obviously accepted by the jury, so incredible or insubstantial that, as a matter of law, it can be discounted.

Under the appropriate standard of review, this court cannot find that the state court's decision was contrary to, or an unreasonable application of, federal law, nor that the state court's factual determinations were unreasonable in light of

the State court record.  Accordingly, the Third Circuit's decision can not be disturbed and petitioner's sufficiency of the evidence claim does not warrant federal *habeas* relief.

## II.  Other Crimes Evidence

Williams contends that the trial court erred when it allowed introduction of evidence of prior acts of domestic violence.  In rejecting this claim on direct appeal, the Louisiana Third Circuit Court of Appeal found no error in the admission of this evidence as the evidence was admitted to show intent and as proof of motive.   The Court found in pertinent part as follows:

> Defendant's prior acts of domestic abuse against his wife were independently relevant to show the volatile nature of the relationship between him and the victim. While Defendant argues that the prior abuses involved a gun, but no gun was involved in the current incident. We note that in the prior incidents, there was no actual testimony that Defendant was threatening his wife with a firearm. Furthermore, as noted above, following the second January 2004 incident, Defendant's firearm was ordered forfeited and destroyed. The evidence reflects that, in each prior offense, Defendant was ordered to stay away from his wife, but each time went right back to her and each time beat her without restraint. While the other crimes evidence was prejudicial, the probative value of the evidence was significant. While the victim's death may have been unintended, the infliction of grievous bodily harm certainly was not. As in *Rose*, 949 So.2d 1236, in the current case, the State could not place the circumstances of the offense in their proper context without reference to the nature of the relationship existing between the Defendant's wife and Defendant.

22

*Williams,* 2011 WL 2149090, at *7.

Federal courts will not grant *habeas* relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) *citing Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir.1983), *cert. denied*, 466 U.S. 984, 104 S.Ct. 2367, 80 L.Ed.2d 838 (1984). The erroneous admission of prejudicial evidence will justify *habeas* relief only if the admission was a crucial, highly significant factor in the defendant's conviction. *Id.*

Here, the trial court committed no error, much less any error creating fundamental unfairness. Like its federal counterpart, Louisiana Code of Evidence article 404(B) generally prohibits the use of other crimes evidence to prove the character of the defendant; however, such evidence is admissible if it is relevant to an issue other than the defendant's bad character. *State v. Jackson*, 625 So.2d 146, 148-149 (La. 1993).  Permissible uses are to show "motive, opportunity, intent, preparation, plan, knowledge, identity, [and] absence of mistake or accident . . . ." L.C.E. art. 404(B).  However, even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. *State v. Rose,* 949 So.2d 1236, 1243 (La. 2007) *citing State v. Martin,* 377 So.2d 259, 263

23

(La.1979).  Even if admissible, the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. *Id.* at 1244 *citing* La. C.E. art. 403.  Because any inculpatory evidence is prejudicial to a defendant, especially when it is probative to a high degree*,* such evidence is excluded only when it is unduly and unfairly prejudicial.  *Id*. Accordingly, in a murder prosecution, the Louisiana Supreme Court has found evidence of prior domestic violence admissible as independently relevant to show the volatile nature of the relationship between a  defendant and his wife, because such evidence tends to show a defendant/husband's motive for commission of his wife's  murder and that he is the perpetrator of the wife's violent death.  *State v. Rose*, 949 So.2d at 1245.

As was found by the Louisiana Third Circuit Court of Appeal, evidence that petitioner had committed prior crimes involving domestic violence was relevant to show not only petitioner's motive, absence of mistake or accident, but also his specific intent to kill or  inflict great bodily harm on his wife, an element of the charged offense.

The State was required to prove that petitioner committed the murder of his wife by intentionally beating and strangling her, as opposed to accidentally injuring his wife when he was attempting to help her while she was ill as argued by petitioner.  Thus, petitioner's lack of accident or mistake and intent were

24

clearly at issue and the evidence was necessary to rebut Williams' defense.

Petitioner's motive for commission of the murder was also at issue.  The other crimes evidence demonstrated petitioner's signature *modus operandi* of committing acts of domestic violence of upon his wife, being ordered to stay away from her following each incident, ignoring this order and going back to his wife, only to beat her again without restraint, culminating in his eventual murder of his wife during the last such episode.   Thus, the evidence that Williams physically abused his wife is independently relevant to show motive and the volatile nature of the relationship between Williams and his wife, thereby discrediting petitioner's defense.  This evidence additionally demonstrated petitioner's fixed and aberrant pattern of behavior that tended to provide a motive and to identify him as the perpetrator in the violent death of his wife.  Indeed, as found by the Third Circuit, the State could not place the circumstances of the offense in their proper context without reference to the nature of the relationship existing between Williams and his wife.

Finally, as found by the Third Circuit, while this evidence was prejudicial, it was nevertheless extremely probative to show motive, absence of mistake or accident, and specific intent to kill or  inflict great bodily harm, and simply does not rise to the level of undue or unfair prejudice when it is balanced against its probative value, especially considering the circumstantial nature of the State's case

against petitioner.  Therefore, the other crimes evidence was admissible in the State's case.

In sum, the State did not introduce evidence of petitioner's prior acts of domestic violence solely to prove Williams' bad character.  Rather, the evidence was independently relevant to other issues for which other crimes evidence is admissible, and was not unduly or unfairly prejudicial.  As such, this evidence was properly admitted. Since the Court has determined that no error occurred in the admission of this evidence, Williams has no basis for any alleged due process violation.  *Robinson v. Whitley,* 2 F.3d 562, 566-67 (5th Cir. 1993).

## III. Victim's Prior Statement

Petitioner contends that under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004) his Sixth Amendment right to confront witnesses was violated when the trial court allowed prior statements of the deceased victim-declarant into evidence during the testimony of Detective Hotard.  These statements were admitted when the State inadvertently played an un-redacted  DVD of the interrogation of Williams in which Detective Hotard told Williams that his deceased wife had told the police on three prior occasions that petitioner had beat her.  These statements were reflected in three prior police reports of domestic abuse between Williams and his wife which Hotard read to Williams during the

26

interrogation.

On direct appeal, the Third Circuit rejected this claim finding that the admission of the decedent's statements constituted harmless error as follows:

> The trial court, in the current case, found that the victim's statement read to Defendant during the interrogation was not so prejudicial that he was denied a fair trial. Finally, even if we consider the statements made by the victim to be testimonial in nature and, therefore, Defendant was denied his right of confrontation of the witness, that the accidental admission of the statements was harmless error.
>
> An error is harmless when it can be shown beyond a reasonable doubt that the complained-of error did not contribute to the verdict. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824 (1967). The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081 (1993); *State v. McQuarter*, 00–1553 (La.App. 4 Cir. 6/6/01), 788 So.2d 1266. *See also State v.. Willis*, 05–218 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, *writ denied*, 06–186 (La.6/23/06), 930 So.2d 973, *cert. denied*, 549 U.S. 1052, 127 S.Ct. 668 (2006). As noted above, Defendant's prior convictions which resulted from the domestic abuse of his wife were deemed admissible and, therefore, inadvertently playing the section of the DVD that contained the victim's statements that Defendant beat her most assuredly did not attribute to the verdict.

*State v. Williams*, 2011 WL 2149090, at *8.

Under the applicable standard of review, the state court's decision should not be disturbed.  Even if the state court's admission of the decedent-victim's statements violated Williams' right to confrontation, the error was harmless.

"Before a court may grant relief on the basis of a violation of the Confrontation Clause, the court must apply harmless error analysis." *Kittelson v. Dretke*, 426 F.3d 306, 319 (5th Cir. 2005) (applying harmless error analysis to an alleged *Crawford* violation). The test for harmless error in a federal *habeas corpus* action brought by a state prisoner is the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), that is, that the constitutional error "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 319-320 *quoting Brecht*, 507 U.S. at 623.  Under *Brecht*, "a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict." *Nixon v. Epps*, 405 F.3d 318, 329-30 (5th Cir. 2005).

In this case, there is no likelihood that the admission of the victim's statements had a substantial and injurious effect on the jury's verdict.  As set forth above, evidence of petitioner's prior acts of domestic violence were properly admitted at trial.  Thus, the jury was properly permitted to hear and consider this evidence.  Therefore,  as found the Third Circuit, the inadvertent playing of the un-redacted portion of the DVD containing the victim's statements about these same prior acts of domestic abuse "most assuredly" did not have a substantial and injurious effect or influence in determining the jury's verdict; simply stated, there

28

is  no  reasonable possibility that this evidence, which was cumulative to properly

admitted evidence, contributed to the verdict.  *Kittelson*, 426 F.3d at 319-320

*quoting Brecht*, 507 U.S. at 623; *Nixon*, 405 F.3d at 329-330.   For these reasons,

any constitutional error committed by the trial court in admitting the victim's

statements was harmless.[6]

## IV.  Closing Argument Time Limitation

Petitioner contends that the trial court abused its discretion by placing an

hour and a half limitation on closing argument which was "insufficient" and

"overshadowed defense counsel's argument and hindered his thought process."

Noting the trial court's "sound discretion" and "great latitude in controlling

the duration and limiting the scope of closing arguments", the Third Circuit found

no merit to this claim on direct appeal as follows:

> In the instant case, Defendant used one hour and twenty-three
> minutes to argue his case, sixty-four pages of transcript. Defendant's
> counsel addressed each witnesses' testimony and reiterated in detail
> his cross-examination of Dr. Trant's and Detectives Credeur's and
> Hotard's testimonies. His argument to the jury was exactly the
> argument presented in the insufficient evidence allegation discussed

---

[6]The undersigned also notes that *Crawford* did not overrule the "rule of forfeiture by
wrongdoing" which extinguishes Confrontation Clause claims when the defendant has procured the
witness' absence.  *See Guilbeau v. Cain,* 2007 WL 2478888, *12 *citing Crawford,* 541 U.S. at 62; *Davis,*
126 S.Ct. at 2280.  It would appear that the Rule may apply to bar petitioner's claim as Williams' actions
caused his wife's unavailability for trial.  However, in the absence of controlling post-*Crawford*
jurisprudence delineating the applicable bounds of the Rule to cases with similar factual scenarios, the
undersigned will do no more than suggest the Rule's possible applicability herein.

above. Defense counsel reminded the jury of their civic duty, discussed all of the responsive verdict options, and even pointed out family members in the courtroom. Although in brief, Defendant asserts only that the time constraint overshadowed defense counsel's argument and hindered his thought process, we found no indication of such after reviewing the sixty-four pages of closing argument.

Furthermore, Defendant does not set forth a particular way in which he was prejudiced by the time limitation or a specific argument he could not address.

*State v. Williams*, 2011 WL 2149090 at * 9.

In order to obtain federal *habeas corpus* relief on grounds of trial error, the

petitioner must show more than prejudice to his substantial rights.  *Kirkpatrick v.*

*Blackburn,* 777 F.2d 272, 279 (5th Cir. 1985).  The petitioner must establish that

the trial error was not merely an abuse of discretion, but also was so grave as to

amount to denial of his constitutional right to due process, that is, that the error

rendered the trial fundamentally unfair.  *Id.*  A trial is fundamentally unfair only

when there is a reasonable probability that the verdict might have been different

had the trial been properly conducted. *Id.*

In this case, petitioner has not established that the trial court's time

limitation on closing argument constituted an abuse of discretion, or that the

limitation made his trial fundamentally unfair.  The trial court acted within its

discretion when it limited the time for closing arguments and the limitation did not

render petitioner's trial so fundamentally unfair so as to violate petitioner's due process rights.  Further, as found by the Third Circuit, petitioner has not established prejudice, much less sufficient prejudice amounting to a denial of fundamental fairness.  To the contrary, the record reveals that defense counsel made a lengthy coherent closing argument in which he highlighted each witnesses' testimony and explained why that testimony established that the State had not proven its case and was insufficient to convict petitioner of the murder of his wife. Moreover, there is no evidence whatsoever that the court's time limitation had any effect whatsoever on defense counsel's argument and in particular, no evidence that the limitation "overshadowed defense counsel's argument" or in any way "hindered his thought process."  In sum, the court can not find that petitioner has demonstrated that there was a reasonable probability that the time limitation on closing argument would have resulted in a different verdict. Therefore this claim has no merit.

## V.  Dr. Collie Trant

Petitioner makes two claims with respect to Dr. Collie Trant – that the trial court erred by accepting Dr. Trant as an expert in forensic pathology and in allowing Dr. Trant to testify as an expert in "bone density". With respect to the former claim, the Third Circuit held in post-conviction proceedings that the trial

31

court did not abuse its discretion in accepting Dr. Trant as an expert. [rec. doc. 1-2, pg. 27,  *State of Louisiana v. Lester Williams*, No.  KH-12-01345 (La. App. 3rd Cir. 6/24/13)]. With regard to the latter, the Third Circuit on direct appeal found the claim was defaulted because counsel failed to make a contemporaneous objection as required by La. C.Cr.P. art. 841.  *Williams*, 2011 WL 2149090 at *10.

Petitioner's first claim is  meritless.  Although Williams makes a passing reference to his Sixth and Fourteenth Amendment rights, petitioner's entire argument focuses on whether, under Louisiana state law, the trial court conducted an adequate inquiry into Dr. Trant's qualifications prior to accepting Dr. Trant as en expert in forensic pathology. Petitioner argues that "Trant never received an undergraduate degree and there was not any testimony of the course of study" and that there was not testimony that Trant was licensed to practice medicine in Louisiana or met the yearly continuing medical education requirements.  [*See* rec. doc. 1-1, pg. 21-22].

Initially, this Court notes that it is without authority to review state law evidentiary rulings.  In *habeas* actions, federal courts do not sit "as a super state supreme court" to review admissibility of evidence under state law.  *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983) *citing Porter*, 709 F.2d at 957; *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998).  Rather, federal courts may intervene only to correct wrongs of federal

32

constitutional dimension.  *See Lavernia v. Lynaugh,* 845 F.2d 493, 496 (5th Cir.

1988).  However, for the reasons set forth below, the undersigned agrees with the

state court's acceptance of Dr. Trant as an expert forensic pathologist.

Louisiana Code of Evidence article 702 permits the admission of expert

testimony when the witness is qualified by "knowledge, skill, experience, training,

or education." In determining whether to accept a witness as an expert, the trial

court has great discretion.  *State v. Craig*, 699 So.2d 865, 870 (La. 1997).  In

addition to the factors listed in article 702, Louisiana courts also look to whether a

witness has previously been qualified as an expert.  *Id.*   "A combination of

specialized training, work experience, and practical application of the expert's

knowledge can combine to demonstrate that a person is an expert.  *State v. Gipson*,

850 So.2d 973, 982 (La. App. 2nd Cir. 2003); *State v. Jarrell*, 994 So.2d 620, 633

La. App. 1st Cir. 2008);  *State v. James,* 2013 WL 11253324, *3 (La. App. 1st Cir.

2013).  Moreover, experience alone may be sufficient to qualify a person as an

expert.  *Jarrell,* 994 So.2d at 633;  *State v. Hurst,* 828 So.2d 1165, 1172 (La. App.

4th Cir. 2002) *citing Belle Pass Terminal, Inc. v. Jolin, Inc.,* 634 So.2d 466, 477

(La. App. 1st Cir. 1994); *Gipson*, 850 So.2d at 982 *citing State v. Kunzman*, 741

So.2d 112 (La. App. 2nd Cir. 1999) and *State v. Smith*, 448 So.2d 778, 780 (La.

App. 2d Cir. 1984) *citing State v. Short*, 368 So.2d 1078 (La.1979); *James,* 2013

33

WL 11253324, at *3; *see also Cheairs v. State ex rel. Dept. of Transportation and Development,* 861 So.2d 536, 542 (La. 2003) (" Experience alone is normally sufficient to qualify a witness as an expert."); *State v. Catchings*, 440 So.2d 153, 157 (4th Cir. 1983) ("Experience, as well as special training, can qualify an individual as an expert witness").

Dr. Trant testified at trial as to his extensive history of training, education and experience in the field of forensic pathology.  He testified that he completed four years of medical school, one year internship in internal medicine and a four year residency in general pathology consisting of two years anatomic pathology, which included performing "hospital autopsies" to determine the cause of death, and two years clinical pathology.  He then completed an additional one year fellowship in forensic pathology, which concerns the specific manner of death and includes training to go to a crime scene and collect trace or other evidence during or before an autopsy.  Dr. Trant testified that, at the time of petitioner's 2009 trial, he had been working as a forensic pathologist for thirty years.  In connection with his work, Dr. Trant  was responsible for publications in his field of expertise.  During his career as a forensic pathologist, Dr. Trant testified that he had performed  "several thousand" autopsies.  Finally, Dr. Trant testified that he had been qualified as a forensic pathologist "a couple hundred" times in various courts.

[rec. pg.1349-1353].

Following the doctor's testimony regarding his extensive experience in the field, the prosecution moved to have Dr. Trant approved as an expert in the field of forensic pathology.  The trial court accepted Dr. Trant as an expert in the field of forensic pathology without objection by defense counsel. [rec. pg. 1353-1354].

In light of Dr. Trant's lengthy experience in the field of forensic pathology, spanning over thirty years, and his extensive work as a forensic pathologist in Louisiana, as well as his having been accepted as a qualified expert in the field of forensic pathology in hundreds of Louisiana courts, a fact which is amply verified in the Louisiana jurisprudence, the trial court committed no error in accepting Dr. Trant as an expert in his field.  The allegation that Dr. Trant was not licensed to practice medicine in Louisiana or failed to meet his yearly continuing medical education requirements is belied by the record and the published jurisprudence, and is of no moment in light of Dr. Trant's extensive education, training, skill and experience in the filed of forensic medicine.  Further, although Dr. Trant admitted that he never received an undergraduate degree, he explained that medical schools occasionally accept individuals who have completed three years of college before they receive an undergraduate degree and he was one of those individuals. [rec. pg. 1539-1540].  That fact in no way detracts from the proven fact that Dr. Trant,

35

did, in fact, thereafter attend and graduate from medical school.  Accordingly,

petitioner is not entitled to federal *habeas corpus* relief with respect to this claim.

Petitioner's second argument,  that the trial court erred in allowing Dr. Trant

to testify as an expert in "bone density" likewise fails.  On direct appeal, the Third

Circuit declined to reach the merits of the claim because counsel failed to make a

contemporaneous objection as required by La. C.Cr.P. art. 841.  *Williams*, 2011

WL 2149090 at *10.  The Louisiana Supreme Court denied writs without

comment.  *State of Louisiana v. Lester Williams*, 76 So.3d 1200 (La. 12/16/2011).

Accordingly, the last reasoned decision on petitioner's claim, that of the Louisiana

Third Circuit Court of Appeal, clearly and expressly relied on a state procedural

rule as the basis for its Judgment.[7]

The State unartfully asserts that this claim is procedurally defaulted noting

on page 4 of its brief the lack of objection and alleging thereafter on page 8 that

"[b]ased on the  procedural bar" petitioner's writ should be denied.  Therefore, the

State did not brief the claim on the merits.  To the extent that the State has raised

---

[7]The Louisiana Supreme Court did not articulate reasons for its denial of writs. However, where
there has been a reasoned state court judgment which explicitly rejects the federal claim on state
procedural grounds, subsequent unexplained judgments upholding the previous judgment or rejecting the
claim are presumed to rely upon the same ground. In other words, when the last reasoned decision on the
claim explicitly relied upon a state procedural default, federal courts must presume that later decisions
rejecting the claim "did not silently disregard that bar and consider the merits."  *Ylst v. Nunnemaker*, 501
U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

petitioner's default, that position is well taken.

The scope of federal *habeas* review is limited by the intertwined doctrines of procedural default and exhaustion. Procedural default exists where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, ("traditional" procedural default), or (2) the petitioner fails to properly exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred, ("technical" procedural default). In either instance, the petitioner is deemed to have forfeited his federal *habeas* claim. *Bledsue v. Johnson*, 188 F.3d 250, 254–55 (5th Cir.1999) *citing Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1986) and *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

The "traditional" procedural default doctrine applies to bar federal *habeas corpus* review when a state court declines to address a prisoner's federal claims because the prisoner failed to follow a state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

Federal courts typically refuse to reach the merits of questions of federal law if the state courts have expressly relied on an "adequate and independent"

37

state procedural ground in refusing to review the claim. "An 'adequate' rule is one

that state courts strictly or regularly follow, and one that is applied evenhandedly

to the vast majority of similar claims." *Glover v. Cain*, 128 F .3d 900, 902 (5th Cir.

1997), *cert. denied*, 523 U.S. 1125 (1998) *citing Amos v. Scott,* 61 F .3d 333, 339

(5th Cir. 1995). A state procedural rule enjoys a presumption of adequacy when

the state court expressly relies on it in deciding not to review a claim for collateral

relief. *Id. citing Lott v. Hargett,* 80 F.3d 161, 165 (5th Cir. 1996). A procedural

rule is "independent" when the last state court rendering a judgment in the case

"clearly and expressly" indicates that its judgment rests on the procedural ground.

*Amos,* 61 F.3d at 338.

The procedural rule identified in this case satisfies both requirements.

Petitioner makes no showing that Louisiana Code of Criminal Procedure article

841 is not evenhandedly applied. Thus, this state court procedural rule is presumed

"adequate."  Moreover, review of published Louisiana jurisprudence establishes

that the Louisiana courts of appeal regularly invoke the contemporaneous

objection rule set forth in article 841 to decline review of similar claims when no

contemporaneous objection is lodged.  Furthermore, both the Fifth Circuit, this

Court and other Louisiana district courts within the Fifth Circuit have held that it

is well-settled that the Louisiana contemporaneous objection rule is an

38

independent and adequate state procedural ground which precludes federal *habeas corpus* review of claims.  *Duncan v. Cain*, 278 F.3d 537, 541 (5th Cir. 2002); *Toney v. Cain,* 24 F.3d 240, 1994 WL 243453, at *2 (5th Cir. 1994).

Furthermore, the rule cited by the Third Circuit is "independent" because the last reasoned judgment on petitioner's claims, that of the Third Circuit Court of Appeals on direct appeal, expressly relied solely on a state procedural rule in declining to reach the merits of petitioner's claim. The Louisiana Supreme Court did not specify reasons for its denial of review, it must therefore be presumed that the Supreme Court, like the Third Circuit, did not reach the merits of the claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

**Cause and Prejudice/Miscarriage of Justice**

Because petitioner's claim is traditionally procedurally defaulted, this Court may refuse to review the merits of this claim unless petitioner demonstrates that he should be excused from application of the procedural default doctrine. This he can

do by showing cause and prejudice for the default[8] or that a miscarriage of justice[9] will result from the denial of federal *habeas* review.  *See Finley*, 243 F.3d 215, 220-221 (5th Cir. 2001); *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565*; McCleskey v. Zant*, 499 U.S. 467, 493-495, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Moore v. Roberts*, 83 F.3d 699, 704 (5th Cir. 1996).

The cause of petitioner's default was his counsel's failure to object to Dr. Trant's testimony.  This failure was clearly not an "impediment external to the defense." Obviously recognizing this fact, petitioner argues by Reply that his counsel was ineffective for failing to object to the claimed "'defects' in Trant's expertise on the subject." [rec. doc. 29, pg. 21].   While ineffective assistance of counsel can constitute cause for a procedural default, before such claim may be used to establish cause to excuse a procedural default, that specific ineffective

---

[8] In *Murray v. Carrier*, the Supreme Court explained that "cause" requires an impediment external to the defense: "[W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard." *Murray v. Carrier*, All U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (internal citations omitted).

[9] In order for a *habeas corpus* petitioner to avoid a procedural default by showing a fundamental miscarriage of justice, the petitioner must assert his actual innocence by showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 106 S.Ct. at 2649; *Glover*, 128 F.3d at 904. To support such an exception, the petitioner must allege that, as a factual matter, he did not commit the crime of which he was convicted. *Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998); *Ward*, 53 F.3d at 108.  Thus, the petitioner must make a "colorable showing of factual innocence." *Callins*, 89 F.3d at 213 *quoting McClesky*, 499 U.S. at 495, 114 S.Ct. at 1471.

40

assistance of counsel claim generally must have been presented to, and exhausted

in, the Louisiana state courts as a separate and distinct claim for relief.   *Edwards*

*v. Carpenter*, 529 U.S. 446, 451, 451-452, 120 S.Ct. 1587, 146 L.Ed.2d 518

(2000); *Murray*, 477 U.S. at 489; *Bishop v. Epps*, 265 Fed.Appx. 285, 290–291

(5th Cir. 2008). Because that claim is itself defaulted, the claim can only serve as

cause for petitioner's claim for relief if petitioner satisfies the cause and prejudice

standard with respect to that ineffective assistance claim itself. *Edward*s, 120 S.Ct

at 1591; *Bishop, supra*. Petitioner has not made this showing. Thus, this Court is

precluded from finding that the alleged ineffective assistance of counsel

constitutes cause for petitioner's default.  This Court therefore need not consider

whether there is actual prejudice.  *Saahir v. Collins*, 956 F.2d 115, 118 (5th Cir.

1992).

Likewise, petitioner has not shown that, as a factual matter, he is actually

innocent of the crime for which he was convicted, and, thus, he will not suffer a

fundamental miscarriage of justice from this Court's failure to consider his claims.

Accordingly, petitioner cannot avoid procedural default on grounds of actual

innocence.

For these reasons, petitioner's claim that the trial court erred by allowing Dr.

Trant to testify as an expert in "bone density", is procedurally defaulted.  Federal

*habeas corpus* relief on this claim is therefore precluded.

Moreover, even if the claim was not procedurally barred, it nevertheless is without merit.  The state court record establishes that Dr. Trant's testimony that the victim did not suffer from osteoporosis was based on his extensive experience in cutting through bone during his several thousand autopsies wherein he had the opportunity to cut through both normal and severely osteoporitic bone, comparing the difference in density to that between cutting through a chicken bone and an eggshell. [rec. pg. 1448-1451, 1500-1501, 1533-1534, 1537-1538, 1541-1542]. Indeed, the trial judge repeatedly stated this fact outside the presence of the jury and while questioning Dr. Trant himself. [rec. pg. 1511, 1513, 1515-1516, 1518-1521, 1525-1526, 1528-1529].  Dr. Trant's unrebutted testimony regarding his extensive experience in cutting through bones and comparing their differences is more than sufficient for the trial court to have permitted, even over objection, Dr. Trant's single statement on direct examination that the victim did not suffer from osteoporosis.[10]  *See Gipson*,. *Jarrell*, *James, Hurst, Kunzman*, *Smith*, *Short*, *Cheairs* and *Catchings, supra.*   For this reason, on cross examination defense

---

[10]On direct examination, Dr. Trant testified that the victim had several freshly broken ribs.  He was then asked, "And from you observation could you tell the jurors what type of force is necessary to cause such breaking of ribs?" Dr. Trant responded, "Well, in some, some older women have osteoporosis, some older men do too –" The prosecutor then asked, "In this case did you find osteoporosis in ...Mrs. Williams?"  He responded, "No, sir.. . ." [rec. pg. 1377].

counsel made numerous valiant attempts to discredit Dr. Trant's single statement on direct examination, to demonstrate to the jury that Dr. Trant was not, in fact, an expert in bone density, and could therefore not render competent testimony on the subject. [Rec. pg. 1496-1497, 1500-1501, 1530-1532, 1535-1536].   Defense counsel's attempts, however, do not negate the fact that Dr. Trant was competent, by virtue of his extensive experience to have made the statement in the first instance.

Finally, even if this particular portion of Dr. Trant's expert testimony was erroneously admitted, any such error in admission was clearly harmless.  Based on his examination of the victim, Dr. Trant determined the cause of the victim's death was manual strangulation. [rec. pg. 1391, 1463-1464, 1550].  This opinion was based on the fact that Dr. Trant's examination revealed fresh bruises on the corner of the victims mouth, face  and collar bone, lacerations on the inside of her lip from compression against her teeth, linear abrasions on the face consistent with fingernails pushed hard against the skin, tiny broken blood vessels (petechiae) in the face and thirty to fifty separate bruises on the inside tissues of the neck, all of which are consistent with manual strangulation.  [rec. pg. 1357-1359, 1362-1363,1364-1365, 1368, 1382-1384, 1391, 1463-1464,1543, 1550].  Whether or not the victim's ribs were also broken by stomping or other violent means, as opposed

to some non-violent process due to a purported osteoporitic condition of the

victim's bones, in no way renders Dr. Trant's testimony as to the cause of death

suspect.  Simply stated,  there is no reasonable possibility or likelihood that Dr.

Trant's testimony regarding the victim's lack of osteoporosis had a substantial and

injurious effect on the jury's verdict.

For these reasons, petitioner's claim fails on the merits.

## VI.  Ricky Eskind

Petitioner next contends that the trial court abused its discretion by

qualifying Ricky Eskind as an expert in death investigations.  Hence, petitioner

complains that Eskind's expert testimony was erroneously admitted at trial.  More

specifically, petitioner argues that Eskind took only one forty hour course at the

St. Louis School of Medicine, that his on the job training was insufficient because

75% of the time he was alone at the scene, and that Eskind had never been

previously accepted as an expert in court. In post-conviction proceedings, the

Third Circuit held that the trial court did not abuse its discretion in accepting

Eskind as an expert. [rec. doc. 1-2, pg. 27,  *State of Louisiana v. Lester Williams*,

No.  KH-12-01345 (La. App. 3rd Cir. 6/24/13)].

Generally, the admissibility of evidence is a matter of state law entrusted to

the discretion of the trial court.  *Beathard v. Johnson,* 177 F.3d 340, 347 (5th

44

Cir.1999).   *Habeas* relief is justified only if testimony was erroneously admitted and the testimony was a "crucial, critical, highly significant factor" in the defendant's conviction. *Porter,* 709 F.2d at 957 *quoting Anderson v. Maggio*, 555 F.2d 447, 451 (5th Cir. 1977); *Skillern,* 720 F.2d at 852; *Little*, 162 F.3d at 862; *Neal*, 141 F.3d at 214.

In the instant case, petitioner's argument focuses on whether, under Louisiana state law, the trial court abused its discretion accepting Eskind as an expert in death investigation, admitting his expert testimony at trial.  To the extent that petitioner contends that the admission of this expert testimony violated his due process rights, that contention is without merit.  The trial court committed no error, much less any error creating fundamental unfairness, when it admitted Eskind's expert testimony.  Contrary to petitioner's allegations, the record contains sufficient evidence of Eskind's knowledge, skill, education, training and experience to qualify him as expert witnesses in the field of death investigation.

Before any witness can testify as an expert, his or her competence must be established to the satisfaction of the court.  *Gipson*, 850 So.2d at 982 *citing*  La. C.E. art. 702, *State v. Kunzman*, 741 So.2d 112 (La.App. 2nd Cir. 1999) and *State v. Esteen*, 846 So.2d 167 (La.App. 5th  Cir. 2003). Competence of an expert is a question of fact to be determined within the sound discretion of the trial judge and

his rulings on the qualifications of experts will not be disturbed in the absence of manifest error, that is, unless they are clearly wrong.  *Id. citing Kunzman*, 741 So.2d at 118 *citing State v. Honeyman*, 565 So.2d 961 (La.App. 2nd Cir. 1990). The test of the competency of an expert is his knowledge of the subject about which he is called upon to express an opinion. *Id. citing Kunzman*, 741 So.2d at 118.  A combination of specialized training, work experience, and practical application of the expert's knowledge can combine to demonstrate that a person is an expert.  *Id. citing Kunzman*, 741 So.2d at 118 *citing State v. Smith*, 448 So.2d 778, 780 (La. App.  2nd Cir. 1984).  A person may qualify as an expert based on experience alone. *Id. citing Kunzman and Smith, supra.*

Eskind testified as to his training, education and extensive experience as an EMT and paramedic beginning in 1993.  Eskind additionally testified that he has been employed as a death investigator for the Iberia Parish Coroner's Office since 2003.  In that capacity, Eskind would go to a scene where a death has occurred to gather information and make observations and photographs.  He would then contact the Coroner to relay the information for determination as to whether the body will be released, be taken to the morgue or taken for an autopsy. Accordingly, he investigates natural deaths, suspicious deaths, suicides, homicides and unexplained deaths.  Since he began with the Coroner's Office, Eskind has

participated in three to five hundred death investigations, two hundred or so which he led. [rec. pg. 1280-1289, 1291].  In terms of formal training, one year after being hired, Eskind attended a forty hour course at the St. Louis School of Medicine "on more specific death investigative skills." [rec. pg. 1285].

On *voir dire* by defense counsel, Eskind testified that he had no other formal training, but that he had received on the job training.  However, 75% of the time, he is alone doing the death investigation.  Moreover, Eskind testified that this was the first time he was being tendered as expert witness. [rec. pg. 1291-1293]. Following *voir dire*, defense counsel did not agree to accept Eskind as an expert witness.  Accordingly, the jury was excused so counsel's objection could be taken up by the Court. [rec. pg. 1293-1295].

Following argument, the Court found as follows:

I think the requirements for expert testimony, I think he's met those with regards to on the job training experience as an EMT and death investigation.  I hear nothing about forensic.  I think he is right about that.  We have dealt with that.  And to the degree that his testimony falls within those scopes, we are fine.  I can tell you EMT is a lot more than anything and, you know, we can all know what the EMT does.

You'll have the opportunity to cross examine his efficiency of what he does as a death investigator but the fact that he has not been tendered before, is not any right to prohibit him from being - - I think he said it was his first time he was tendered, so it's not like he was tendered and declined.

47

I think, certainly, his education.  We also have no information to go by - - that a death investigator requires more training that he did have.  I think he is qualified to offer his opinion and to start as an expert in EMT, as well as death investigation.

The Court will - - if anybody offers evidence or opinion outside of this scope, I'll make the call based on what I've heard about his training and opinion.  So for these reasons I will admit him in the field that he is - - well, in the field of EMT and death investigation.
. . .
based on what he said - - conclusions.  He can give opinion as an EMT and death investigator.  We had cross examination, and all that with regards to his training and know-how, the sufficiency of his training.  I don't see anything in that which prohibits him being submitted as an expert in EMT and death investigation.

[rec. pg. 1295-1296].

In light of Eskind's lengthy on the job experience performing death investigations for the Iberia Parish Coroner's Office, spanning approximately six years at the time of trial, his having been involved in three to five hundred such investigations, two hundred of which he was the lead investigator, as well as his having completed a specialized course in the field, combined with the undisputed fact noted by the state trial court that there is no evidence that any particular formal training is required to perform such work,  trial court committed no error in accepting Eskind as an expert in his field.  Further, the fact that he had not previously been accepted as an expert in court is of no import in light of Eskind's

48

extensive experience, training and education in the field of death investigations. Indeed, as the trial court correctly noted in her ruling he had never before been tendered as an expert, not that he had been tendered and declined; there always has to be a first time, otherwise there would never be any experts.

Since the undersigned has determined that no error occurred in the admission of Eskind's testimony as he was a qualified expert in his field of death investigation, petitioner has no basis for any alleged due process violation. *Robinson,* 2 F.3d at 566-67.

Moreover, even if Eskind's expert testimony had been erroneously admitted, the majority of Eskind's testimony was not the presentation of expert opinion per se, but rather was focused on Eskind's factual description of the photographs he had taken and the condition of the victim's body which he observed and felt, primarily that he observed bruising and rigor mortis and that the body was cold.  A lay witness could have testified to these same facts.  Further, Dr. Trant testified about these same physical findings, albeit in much more detail than Eskind. Eskind merely arrived on the scene, which law enforcement was already treating as a potential crime scene, took photographs, visually examined the body with minimal physical contact.  Thereafter, he called the Coroner for the Coroner to make the determination as to whether the body would be transported to the morgue and thereafter for autopsy. [rec. pg. 1326-1327].  Indeed, the primary expert

opinion given by Eskind was that the victim had died two to twenty-four hours

prior to Eskind's arrival [rec. pg. 1329], which, on cross-examination, Eskind

agreed was consistent with petitioner's version and time-line of events, namely,

that he said the victim had stopped breathing two hours ago.  [rec. pg. 1336-1337].

Under these circumstances, the undersigned cannot find that the testimony was a

"crucial, critical, highly significant factor" in the defendant's conviction. *Porter,*

709 F.2d at 957; *Anderson*, 555 F.2d at 451; *Skillern,* 720 F.2d at 852; *Little*, 162

F.3d at 862; *Neal*, 141 F.3d at 214.  Accordingly, *habeas* relief is not warranted.

## VII.  Sufficiency of Second Degree Murder Indictment

Petitioner contends, without citing any statutory or jurisprudential support,

that the State failed to file a written amended Indictment, "re-endorsed by the

original grand jury foreman "a true bill", charging him with second degree murder

as "mandated by law", thereby depriving the state court of jurisdiction and

rendering all proceedings thereafter a nullity.  The facts underlying this claim are

as follows.  On April 25, 2006, petitioner was indicted by the grand jury on a

charge of first degree murder. [rec. pg. 60].  During a pre-trial conference on

January 7, 2009, the State orally amended the Indictment, on the record in open

court, to charge petitioner with second degree murder. [rec. pg. 24].

The sufficiency of a state indictment is appropriate for federal *habeas* relief

only when the indictment is so deficient that the convicting court was without jurisdiction. *Williams v. Collins*, 16 F.3d 626, 637 (5th Cir. 1994) *citing Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993); *see also Liner v. Phelps*, 731 F.2d 1201, 1203 (5th Cir. 1984).  State law dictates whether a state indictment is sufficient to confer a court with jurisdiction.  *Williams*, 16 F.3d at 637.  If  the question of the sufficiency of an indictment has been presented to the state's highest court of appeals, then consideration of the question is foreclosed in federal *habeas corpus* proceedings.  *Morlett v. Lynaugh*, 851 F.2d 1521, 1523 (5th Cir. 1988); *Wood v. Quarterman*, 503 F.3d 408, 412 (5th Cir.2007) and *McKay v. Collins*, 12 F.3d 66, 68-69 (5th Cir. 1994).

The Third Circuit summarily denied this claim in post-conviction proceedings finding that "[t]he State was not required to make a formal written amendment to the indictment to try [petitioner] for second degree murder", citing *State v. Seals*, 83 So.3d 285 (La. App. 5th Cir. 2011), *writ denied*, 99 So.3d 53 (La. 2012) in support of its decision. [rec. doc. 1-2, pg. 27,  *State of Louisiana v. Lester Williams*, No.  KH-12-01345 (La. App. 3rd Cir. 6/24/13)].   The Louisiana Supreme Court implicitly adopted the Louisiana Third Circuit Court of Appeals' finding and rejected petitioner's contention that the indictment was fatally defective when it denied relief without comment. [rec. doc. 1-2, pg. 28;  *State of Louisiana ex rel.*

*Lester Williams*, 2013-1770,  133 So.3d 672 (La. 2/21/2014)].  *Bowens v. Cain,*

2011 WL 4381540, *9 (E.D. La. 2011); *Dowell,* 805 F.Supp. at 1343; *Hines,* 102

F.Supp.2d at 695;  *Morlett,* 851 F.2d at 1523.  Thus, petitioner is foreclosed from

seeking relief on this ground in a federal *habeas* proceeding.  By refusing to grant

petitioner relief, the Louisiana Supreme Court necessarily, though not expressly,

found that the indictment was not fatally defective.  Hence, the trial court had

jurisdiction, and the indictment was sufficient for that purpose.

Contrary to petitioner's allegations, under Louisiana law, there was no need

for the State to file a written amended Indictment or to obtain re-endorsement or

re-indictment by the grand jury.  District Attorneys are empowered to amend

indictments to charge lesser offenses, without the necessity of a formal written

amendment or further involvement of the grand jury.  *State v. Seals*, 83 So.3d at

351-352 *citing* La. C.Cr.P. art. 487, *State v. Davis*, 385 So.2d 193, 196 (La. 1980),

*State v. Edwards*, 287 So.2d 518, 525 (La. 1973) and *State v. Domingue*, 517

So.2d 346, fn. 1 (La. App. 1ˢᵗ Cir. 1987).  This is so because second degree murder

is a responsive verdict and under the facts of this case, a lesser included offense of

first degree murder.  *Id.*  Thus, when the State abandons the charge of the greater

offense and proceeds with prosecution of the lesser offense,  the defendant is

deemed to have adequate notice of the charge against him.  *Id*.

For these reasons, there is no basis for this Court to grant *habeas* relief.

## VIII.  Constitutionality of Mandatory Life Sentence

Petitioner argues that his mandatory life sentence without benefits violates his Eighth and Fourteenth Amendment rights.  More specifically, petitioner asserts that La. R.S. 14:30.1 is unconstitutional because the statute "limits the sentencing authority any discretion in the determination of the sentence that is imposed . . . [and is] without any viable mechanism for release through rehabilitation. . . ." Petitioner further argues that because the United States Supreme Court has ruled that a mandatory life sentence without parole for juvenile homicide offenders is unconstitutional, the same rule should apply to him.  Petitioner is wrong on both counts.

Petitioner did not raise this claim at sentencing or on direct appeal.  Rather, the claim was asserted in post-conviction proceedings, where the Third Circuit found this claim procedurally barred  under *State ex rel. Melinie v. State*, 665 So.2d 1172 (La. 1996), which forbids consideration of sentencing claims in post-conviction proceedings.  The Court has not addressed petitioner's procedural default *sua sponte* because the State did not raise the issue in responsive pleadings. The Court notes, however, that the procedural bar set forth in *Melinie* has been held to constitute an independent and adequate state procedural rule sufficient  to bar federal *habeas* review of sentencing claims.  *See e.g. Williams v.*

53

*Cain*, 2006 WL 3240766, *33-34 (W.D. La. 2006); *Webb v. Goodwin*, 2014 WL

5092034, *4-6 (W.D. La. 2014).  Although this Court, under certain circumstances

could raise petitioner's procedural default *sua sponte,* because the State did not

raise the issue in responsive pleadings, and failed to brief the issue, the Court

declines to do so.  *See United States v. Willis*, 273 F.3d 592, 596 (5th Cir. 2001)

*citing Magouirk*, 144 F.3d at 358, and *Smith v. Johnson*, 216 F.3d 521, 523-524

(5th Cir. 2000).

The Louisiana Supreme Court has consistently upheld the constitutionality

of mandatory life sentences for the crime of second degree murder and other

serious felonies, as the decision to assess such a sentence is within the prerogative

of the legislature, based on the culpability of the offender and gravity of the

offense.  *State v. Parker*, 416 So.2d 545, 552 (La.1982);  *State v. Landry*, 388

So.2d 699, 706 (La.1980); *State v. Daniel*, 378 So.2d 1361, 1365 (La.1979); *State*

*v. Brooks*, 350 So.2d 1174, 1176 (La.1977).[11]  With regard to excessiveness under

---

[11]Further, contrary to petitioner's argument, under *State v. Dorthey*, 623 So.2d 1276, 1278
(La.1993) and *State v. Johnson*, 709 So.2d 672, 676 (La. 1998), the sentencing court could have
refused to apply the mandatory life sentence for petitioner's second degree murder conviction if
petitioner had rebutted the presumption that the mandatory life sentence is constitutional,
showing by clear and convincing evidence that his case was "exceptional", meaning that unusual
circumstances were present that made the life sentence not meaningfully tailored to his
culpability, the gravity of the offense, and the circumstances of the case.  *See State v. Martin,*
2010 WL 3527209, *2-3 (La. App. 1st Cir. 2010).  Petitioner made no such showing.  To the
contrary, as set forth above, the present claim was not raised at sentencing or on direct appeal and
was found by the state court to be procedurally barred under *State ex rel. Melinie v. State*, 665
So.2d 1172 (La. 1996).

the Eighth Amendment, if a sentence is within the statutory limits, a federal

*habeas* court will not upset the terms of the sentence unless it is grossly

disproportionate to the gravity of the offense.  *Harmelin v. Michigan*, 501 U.S.

957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Solem v. Helm*, 463 U.S. 277, 103

S.Ct. 3001, 77 L.Ed.2d 637 (1983).  Gross disproportionality is found only in the

"exceedingly rare" and "extreme" case.  *Ewing v. California*, 538 U.S. 11, 21, 120

S.Ct. 7, 145 L.Ed.2d 16 (2003) *citing Rummel v. Estelle*, 445 U.S. 263, 272, 100

S.Ct. 1133, 63 L.Ed.2d 382 (1980); *Harmelin*, 501 U.S. at 963, 1001 (Kennedy, J.,

concurring).  Given the culpability of the offender and gravity of the offense, this

court and other federal courts within this Circuit have repeatedly found that a life

sentence without benefit of parole, probation, or suspension of sentence for an

adult convicted of the crime of second degree murder is not grossly

disproportionate to the offense and hence, is not constitutionally excessive.

*Thomas v. Warden, Louisiana State Penitentiary*, 2011 WL 5570083, *6 (W.D.

La. 2011) *citing  Jones v. Cain*, 2010 WL 3924010, *10–11 (E.D. La.2010); *Lewis*

*v. Warden Louisiana State Penitentiary*, 2014 WL 5365401, *10 (W.D. La. 2014)

*citing Beaner v. La. State Penitentiary*, 2013 WL 4411093 at *9 (W.D. La. 2013),

*Holmes. v. Tanner*, 2011 WL 5869396 at *6–7 (E .D. La.2011), and *Taylor v.*

*Cain*, 2007 WL 1805668 at *20–21 (E.D. La.2007).   Indeed, the Supreme Court

has upheld a mandatory life sentences for nonviolent offenses far less severe than

the murder for which petitioner was convicted.  *Harmelin v. Michigan*, 501 U.S.

957 (1991) (upholding mandatory life sentence without possibility of parole for a

conviction of possession more than 650 grams of cocaine, despite a lack of

consideration of mitigating factors such as no prior felonies); *Rummel v. Estelle*,

100 S.Ct. 1133 (1980) (upholding mandatory life sentence for recidivist whose

third felony conviction was obtaining $120.75 by false pretenses and whose prior

crimes were similar property crimes).

　　　To the extent that petitioner argues a violation of his equal protection rights,

that claim is equally without merit.  Petitioner argues that since the Court in *Miller*

*v. Alabama*, ⎯⎯ U.S. ⎯⎯, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) found that

the mandatory imposition of a life sentence without parole for a juvenile (under

the age of 18) convicted of homicide violated the Eighth Amendment, that

although he is an adult, the Equal Protection Clause requires that he be treated

equally, and accordingly that his mandatory life sentence be deemed

unconstitutional.  Simply stated, petitioner argues that the Equal Protection Clause

requires this Court to construe *Miller* to apply to him.

　　　Petitioner's claim is meritless.  The *Miller* Court was clear that it was

assessing the lawfulness of  mandatory life sentences in the case of juveniles only.

In so doing, The Court expressly reaffirmed the constitutionality of its prior precedent upholding the constitutionality of mandatory life without parole sentences for adult offenders, finding that precedent "had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders." *Miller,* 132 S.Ct. at 2470 *citing Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

Furthermore, petitioner has not identified any decision by the Supreme Court, or any other court, that has held that a mandatory life sentence without benefits for an adult convicted of second-degree murder violates the Equal Protection Clause of the Fourteenth Amendment.   More specifically, petitioner points to no authorities that suggest that the Equal Protection Clause of the Fourteenth Amendment requires that adults and juveniles be sentenced according to the same scheme.  To the contrary, the *Miller* Court expressly rejected that argument.

The Equal Protection Clause directs only that all persons "similarly situated" be treated alike. *See City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  In *Miller,* however, the Court expressly observed that "children are *constitutionally different* from adults for purposes of sentencing . . . [b]ecause juveniles have diminished culpability and greater prospects for reform . .

57

. they are [therefore] less deserving of the most severe punishments." *Miller*, 132 S.Ct. at 2464 (emphasis added).   In finding that a mandatory life sentence for a juvenile murderer violated the Eighth Amendment prohibition against disproportionate punishments, the *Miller* Court  identified "three significant gaps between juveniles and adults." *Id.* at 2464.   "First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking." *Id. citing  Roper v. Simmons*, 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (internal quotations omitted). "Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment  and lack the ability to extricate themselves from horrific, crime-producing settings." *Id.*  (internal quotations omitted).  And third, "a child's character is not as well formed as an adult's; his traits are 'less fixed' and his actions less likely to be evidence of irretrievable depravity." *Id. citing Roper*, 543 U.S. at 570 (internal quotations omitted).   Simply stated, it was the differences between juvenile and adult offenders, that is, the "distinctive attributes of youth" "which undermined the rationales for punishment" that justified  differential sentencing treatment for juveniles as opposed to adults. *Miller*, at 2465 and 2466.

For these reasons, the Equal Protection Clause of the Fourteenth

Amendment does not require this Court to construe *Miller* to apply to him. Petitioner's argument fails and he is entitled to no relief.

## IX.  Jurors Excused for Hardship

Petitioner alleges that the trial court abused its discretion when it excused potential jurors for hardship reasons, thereby denying him a fair trial.  More specifically, petitioner argues that the trial court abused its discretion and denied him a fair trial when it excused Ruth Guidry because she was expecting her first grandchild, Judy Broussard because she needed to care for her grandchild, but did not release Kenra Castillo, who had to care for three children.  He further argues that the trial court released Debra Corpus, Diana Coler and Dawn Daigle without requiring "verification", while requiring "verification" from potential jurors Brady Webb, who had previously had a heart attack and was on 8 different medications, and Susan Sinitiere, who had bladder surgery.  Petitioner complains that these actions "open[ed] the door for possible biases and discriminatory acts and thereby [were] unconstitutional and prejudice[d] Williams because there is a probable likelihood that these prospective jurors could have been the persons to vote not guilty."

In post-conviction proceedings the Third Circuit rejected this claim finding that petitioner "failed to make a showing of fraud or irreparable injury regarding

59

the trial court's excusing prospective jurors on the basis of hardship." [rec. doc. 1-2, pg. 27, *State v. Williams*, KH 12-1345 (La. App. 3rd Cir. 2012)].

The Sixth Amendment and Fourteenth Amendments provide a defendant with the right to a fair trial, which includes the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Miniel v. Cockrell*, 339 F.3d 331, 338 (5th Cir. 2003).  A defendant is afforded an impartial jury so long as the jurors will conscientiously apply the law and find the facts.  *Lockhart v. McCree*, 476 U.S. 162, 178, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1982).  Moreover, "[a] fair trial in a fair tribunal is a basic requirement of due process."  *Morgan,* 504 U.S. at 727 *citing  In re Murchison*, 349 U.S. 133, 136 (1955).   In this context,  "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it."  *Lockhart,* 476 U.S. at 178 *quoting Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).   A trial is fundamentally unfair only when there is a reasonable probability that the verdict might have been different had the trial been properly conducted.  *See Kirkpatrick,* 777 F.2d at 279.

Further, a defendant is not entitled to a jury of any particular composition, so long as the jury pool, panel or venire from which a jury is drawn does not systematically exclude any distinctive group in the community.  *Taylor v.*

60

*Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 702 (1975).  Nevertheless, it has long

been held that "[t]he States are free to grant exemptions from jury service to

individuals in case of special hardship or incapacity and to those engaged in

particular occupations the uninterrupted performance of which is critical to the

community's welfare."  *Taylor,* 419 U.S. at 534 *citing Rawlins v. Georgia*, 201

U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899 (1906).  Thus, "[e]ven when persons liable to

jury duty under the state law are excluded, it is no ground for challenge to the

array, if a sufficient number of unexceptional persons are present."  *Rawlins*, 201

U.S. at 560-561.  Under Louisiana law, the court may excuse a member of the petit

jury venire "[i]f jury service . . . would result in undue hardship or extreme

inconvenience. . . ."  La. C.Cr.P. art. 783(B).

In this case, petitioner has failed to demonstrate that any of the complained

of six potential jurors were of any distinctive group, that they were dismissed on

racial or any other impermissible grounds, or that any such dismissal rendered his

trial fundamentally unfair, so as to violate petitioner's Constitutional rights.

Instead, petitioner conclusorily, without any supporting evidence and without

citing any jurisprudence supporting his position, asserts the possibility of bias and

discrimination and the "probable likelihood" that the excluded prospective jurors

could have voted not guilty had they ultimately been selected to serve.  Such

speculative, conclusory and unsupported allegations are insufficient raise a constitutional issue in a habeas proceeding.  *United States v. Woods,* 870 F.2d 285, 288 n. 3 (5th Cir. 1989) *citing  Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) ("Although *pro se* habeas petitions must be construed liberally, 'mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue."), *United States v. Pineda,* 988 F.2d 22, 23 (5th Cir. 1993) (same), *Beazley v. Johnson*, 242 F.3d 248, 270 (5th Cir. 2001) ("conclusory allegations are insufficient to raise a constitutional issue") and *Mayberry v. Davis*, 608 F.2d 1070, 1072 (5th Cir. 1979).

Moreover, the record discloses that each complained of juror  was dismissed by the trial court in accordance with Louisiana law on grounds of undue hardship and extreme inconvenience, and that a sufficient number of unexceptional persons remained present and were included in the petit jury venire.  Thus, petitioner's claim is without merit.

Ruth Guidry was released because she was expecting her first grand child who was to be born that day or the next, her son worked offshore and she was "on call" if it did not arrive that day and she therefore would be preoccupied and not able to concentrate on the trial. [rec. pg. 375].  Judy Broussard's daughter in law was having four wisdom teeth pulled out and she had to watch her seven year old

daughter, both of whom were going to stay at Broussard's house following the oral surgery. [rec. pg. 394-395].  Debra Corpus had just started a new job preparing taxes the day before. [rec. pg. 366-367].  Diana Coler had been involved in a serious motor vehicle accident in which she suffered a neck injury and for which she was still treating and taking Lortabs. She was excused on condition that information from her physician be provided.  [rec. pg. 376-377].  Dawn Daigle had been to the emergency room and diagnosed with endometriosis, for which surgery had been scheduled, and as a result of which she had not returned to work. The Court excused Ms. Daigle noting that he had medical hardship information from her. [rec. pg. 403-405].

The trial judge did not excuse Kenra Castillo for cause because his excuse, unlike that of Ruth Guidry and Judy Broussard, was not that he had to care for his children or the children of a family member, but rather that he had to care for his girlfriend's three sons because she had gone to jail the week before trial.  The Court told Castillo that he would have to get someone to help with that. [rec. pg. 396].   Brady Webb and Susan Sinitiere presented with non-acute medical conditions of a less serious nature than the conditions of Debra Coler and Dawn Daigle.  Brady Webb stated that although he had previously had a heart attack and was on medications, his doctor told him if he was "breathing, go to court" [rec. pg.

385].   Susan Sinitiere, who had bladder surgery, stated that she was already back to work and the Court advised that her frequent urination could be accommodated, to which Ms. Sinitiere voiced no objection. [rec. pg. 388].

Finally, after excluding the complained of six potential jurors for hardship, two separate panels consisting of twenty-one jurors each was randomly assembled, from which, after the exercise of peremptory challenges by both the defense and the State, petitioner's jury was ultimately chosen. [tr, pg. 413-420; 683-695]. There is no allegation or any suggestion that the jury which was chosen was in any way impartial or unwilling to decide the case solely on the evidence before it.

For these reasons, federal *habeas* relief is not warranted.

## X.  Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed. 2d 674 (1984).

The burden is on the petitioner to show that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 688.  Judicial scrutiny of

64

counsel's performance must be "highly deferential," and the court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's alleged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689.  The court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (citation omitted).  Thus, this court's review "strongly presum[es] that counsel has exercised reasonable professional judgment."  *United States v. Payne*, 99 F.3d 1273, 1282 (5th Cir. 1996) *quoting  Lockhart v. McCotter*, 782 F.2d 1275, 1279 (5th  Cir. 1986).

Courts may "not find ineffective assistance of counsel merely because [the court] disagree[s] with counsel's trial strategy." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) *citing Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997). Rather, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Martinez v. Dretke,* 404 F.3d 878, 885 (5th Cir. 2005); *United States v. Cavitt*, 550 F.3d 430, 440 (5th Cir. 2008*) quoting Crane*, 178 F.3d at 314.

*Strickland's* prejudice element requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[12] A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) *citing Strickland,* 104 S.Ct. at 2068.

A petitioner must affirmatively prove prejudice. *Deville*, 21 F.3d at 659; *Mangum v. Hargett*, 67 F.3d 80, 84 (5th Cir. 1995); *Earhart v. Johnson*, 132 F.3d 1062, 1066 (5th Cir. 1998). Self serving conclusory statements that the outcome would have been different "fall far short of satisfying *Strickland's* prejudice element." *Sayre*, 238 F.3d at 635. Moreover, allegations of a mere possibility of a different outcome are insufficient to establish prejudice. *Lamb v. Johnson*, 179 F.3d 352, 359 (5th Cir. 1999).

---

[12]The *Strickland* court outlined the extent of prejudice that must be established by the defendant:
An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of the criminal proceeding if the error had no effect on the judgment. *Cf. United States .v Morrison,* 449 U.S. 361, 364-65 (1981).

Defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability exists if the probability is sufficient to undermine confidence in the outcome.

When a defendant challenges a conviction , the question is whether there is reasonable probability that absent the errors the fact-finder would have a reasonable doubt respecting guilt.
*Strickland, supra*, at pages 691-692.

66

Because both *Strickland* factors, that of deficient performance and prejudice, must be satisfied, "an ineffective assistance contention may be rejected on an insufficient showing of prejudice, without inquiry into the adequacy of counsel's performance." *Strickland,* 466 U.S. at 689-94.  Petitioner must satisfy both prongs of *Strickland,* demonstrating both that counsel's  performance was deficient and that the deficiency prejudiced the defense.  *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999); *Green v. Johnson,* 160 F.3d 1029, 1035-36 (5th Cir. 1998).

Petitioner alleges that his counsel was ineffective for (a) failing to investigate and subpoena records favorable to the defense, (b) failing to hire or consult expert witnesses, (c) failing to challenge the qualifications of the jury, (d) denying petitioner his right to testify, (e) failing to challenge the affidavit in support of the arrest warrant, and, (f) failing to request *voir dire* on the issue of racial prejudice.

The Third Circuit rejected all of petitioner's ineffective assistance of counsel claims, *in globo*, finding that petitioner had failed to carry his burden.  [rec. doc. 1-2, pg. 27, *State v. Williams*, No. KH 12-1345 (La. App. 3rd Cir. 2013)].  For the reasons which follow, under the applicable standard of review, the Louisiana state courts' disposition of petitioner's ineffective assistance of counsel claims should

not be disturbed.

**Failure to Hire an Expert**

Petitioner alleges that his counsel was ineffective for failing to hire or consult an independent expert to "contradict Dr. Trant or to explain some issues that he left unresolved."  Petitioner is not entitled to relief herein as petitioner has failed to affirmatively demonstrate that any deficiency in his counsel's failure to obtain an independent  expert caused him actual prejudice.  In both this court and the state court, petitioner failed to identify a qualified expert capable of testifying favorably on petitioner's behalf, or more specifically, capable of testifying contrary to Dr. Trant.  This failure is fatal to his *habeas* claim.  *Pitts v. Tanner,* 2015 WL 10045174, *19 (W.D. La. 2015) *citing Pierce v. Warden, Louisiana State Penitentiary,* 2009 WL 55937, *39-40 (W.D. La. 2009) (and cases cited therein[13]); *United States v. Bernard*, 762 F.3d 467, 473 (5th Cir. 2014) (analyzing a

---

[13]*Earhart v. Johnson*, 132 F.3d 1062, 1067-1068 (5th Cir. 1998) ("Earhart's failure to identify an expert whose testimony would have altered the outcome of his trial is fatal to his *habeas* claim."); *Evans v. Cockrell*, 285 F.3d 370, 377-378 (5th Cir. 2002) (petitioner presented no evidence of the results of scientific tests yielded and thus his unsupported claims failed to demonstrate reasonable doubt concerning his guilt or that his counsel deprived him of a fair trial); *Crane v. Johnson*, 178 F.3d 309, 315 (5th Cir. 1999) ("[E]ven assuming that trial counsel erred in failing to seek the appointment of a confidential mental health expert, Crane has not shown how he suffered prejudice from this failure. Crane produced no persuasive psychiatric evidence in the district court that if produced at trial, would have undermined confidence in the resulting verdict.); *Cockrell v. Dretke,* 88 Fed.Appx. 34, 38 (5th Cir. 2004) (petitioner failed to satisfy his burden because no experts substantiated petitioner claims); *Brigham v. Cockrell,* 2002 WL 1776933 at *4 (N.D. Tex. 2002) *citing Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir. 1994) ("petitioner has failed to identify a qualified expert capable of testifying on this subject. . . " and the court cannot even begin to analyze ineffective assistance of counsel claim without affirmative showing of missing evidence or testimony); and *Gibson v. Dretke*, 2003 WL 22287516, *5 (N.D. Tex. 2003) ("Gibson has failed to show a reasonable probability that an independent expert witness would have been of assistance to the defense and that denial of such expert assistance resulted in a

failure to call an expert as an uncalled witness claim).

Although petitioner speculates as to the content of the unidentified expert's testimony, he fails to affirmatively demonstrate that such testimony would not only have been available, but also would have been sufficiently exculpatory to have undermined confidence in the resulting verdict.  Such speculative, hypothetical, conclusory and self-serving allegations of what an unidentified expert might have said are insufficient to warrant *habeas* relief.  *Id. citing Bernard*, 762 F.3d at 473; *Pierce,* 2009 WL 55937, *at 40 (and cases cited therein[14]).  Moreover, petitioner has not alleged or even suggested that with the testimony of an independent expert the outcome of petitioner's trial would have been different.  Accordingly, petitioner has not satisfied *Strickland'*s prejudice element.

Furthermore, petitioner has failed to show that counsel's alleged failure was

---

fundamentally unfair trial).

[14]*Lovett v. State*, 627 F.2d 706, 709-710 (5th Cir. 1980); *Brigham,* 2002 WL 1776933 at *4 (other than speculating. . . petitioner offers no evidence that any coercive, suggestive, or otherwise inappropriate techniques were used in this case.  Without such evidence, the Court cannot conclude that the testimony of an expert would have affected the outcome of the trial."), *Gibson*, 2003 WL 22287516 at *5; *Price v. Dretke*, 2003 WL 22519439, *6 (N.D. Tex. 2003)*, Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir.1983) (emphasizing that mere conclusory allegations do not raise constitutional issues in habeas proceedings); *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir.1985) ("for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial."); *Martin v. McCotter,* 796 F.2d 813, 819 (5th Cir.1986) ("hypothetical or theoretical testimony will not justify the issuance of a writ. . . ."); *Buckelew v. United* States, 575 F.2d 515, 521 (5th Cir. 1978); *Boyd v. Estelle,* 661 F.2d 388, 390 (5th  Cir.1981); *Green,* 160 F.3d at 1043; and *Sayre,* 238 F.3d at 635.

deficient.  Petitioner's counsel thoroughly and effectively cross-examined Dr.

Trant regarding his examination of the victim and his conclusions as to the cause

of the victim's death.  He highlighted that Dr. Trant was not provided a history that

the victim had been sick, throwing up and falling down, that although in 90% of

strangulation cases the victims have petechiae but that was not present in the

victim, and that the victim's hyoid bone was not broken as in manual strangulation

cases.  [rec. pg. 1426-1429, 1434-1435, 1438]. He further undermined Dr. Trant's

testimony casting doubt about his testimony regarding the victim's lack of

osteoporosis and his potential bias given that Dr. Trant testified for the State in

most cases. [rec. pg. 1500-1501, 1530-1537, 1461].  In the absence of any

competent evidence that examination by an independent expert would have

resulted in findings or conclusions contrary to those testified to by Dr. Trant at

trial, the undersigned cannot find that counsel's decision not to obtain an

independent expert was objectively unreasonable.

Finally, given Dr. Trant's testimony, it is unlikely that an independent expert

would have contradicted his conclusions.  Rather, the testimony of an additional

expert would most likely have merely confirmed Dr. Trant's findings and

conclusion as to the cause of death, thus strengthening the State's case.  Similar

decisions made in order to avoid the risk of compounding unfavorable evidence

against the defendant have been held not to amount to attorney error.  *Pitts,* 2015 WL 10045174 at *20 *citing Wilson v. Cain*, 2006 WL 3759686, at *20 *citing Thompson v. Cain*, 161 F.3d 802, 813-814 (5th Cir. 1998).  It is often more effective to elicit testimony from the State's expert in support a defense argument that the prosecution has not proved its case, than to present such evidence through an expert paid for and retained by the defense.  Indeed, the Supreme Court has similarly opined stating that it is sometimes is better to try to cast a pervasive suspicion of doubt over the strength of the State's case, rather than "to strive to prove a certainty that exonerates." *Richter*, 562 U.S. at 109, 131 S.Ct. at 790.

For these reasons, petitioner has not demonstrated *Strickland* prejudice, nor has he shown deficient performance as defense counsel's treatment of the forensic expert evidence was entirely reasonable.  Petitioner's claim this his counsel was ineffective for failing to obtain an independent forensic expert is without merit.

**Failure to Investigate and Subpoena Record**s

In a related claim, petitioner contends that he received ineffective assistance of counsel because counsel failed to investigate the facts by retrieving evidence not tested by the State (tissue paper, mattress cuttings, carpet stains and blood splatter) to have this evidence evaluated, presumably by an unnamed defense expert.  He additionally alleges that counsel was ineffective by failing to subpoena

the victim's medical records to prove the existence of cirrhosis and osteoporosis and failing to interview the police officers or "other state witnesses known to him".

With respect to the former claim, for the same reasons set forth above petitioner has not demonstrated *Strickland* prejudice, nor has he shown deficient performance.  Petitioner has presented no evidence that independent testing would have resulted in exculpatory evidence  sufficient to have undermined confidence in the resulting verdict or changed the outcome of petitioner's trial.  Furthermore, petitioner's  counsel thoroughly and effectively cross-examined the State's witnesses highlighting the fact that no testing of the tissue paper, mattress cuttings, carpet stains and blood splatter was performed thereby "casting a pervasive suspicion of doubt over the strength of the State's case." *See Richter*, 562 U.S. at 109, 131 S.Ct. at 790.  Indeed, in closing argument counsel pointed to the lack of sufficient investigation and testing of available evidence as a primary basis for exonerating petitioner and finding him not guilty of the murder of his wife. [rec. pg. 2172-2178, 2181-2184,2203-2210, 2241, 2236].  Under these circumstances, the court cannot find that counsel's decision not to test the complained of previously un-tested evidence was objectively unreasonable.

The latter claim fares no better.   Under *Strickland*, counsel need only

provide reasonable professional assistance.  *Cullen v. Pinholster*, - - U.S. - - , 131 S.Ct. 1388, 1406–07, 179 L.Ed.2d 557 (2011) (discussing *Strickland* and post-*Strickland* cases). "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Druery v. Thaler,* 647 F.3d 535, 541 (5th Cir. 2011) *citing Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993) *quoting United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

The record in this case is clear that counsel investigated and challenged all of the alleged deficiencies and alleged errors of law enforcement officers in this case, as well as the alleged shortcomings in the examination and conclusions reached by Dr. Trant,  by cross-examination at trial.  Counsel's actions under the circumstances were entirely reasonable.  Indeed, from the record before this Court, it appears that counsel made virtually every challenge to the evidence and testimony which was available to petitioner.  Counsel then skillfully summarized all of this evidence for the jury during closing, arguing that the State had not met its burden of proof.  Williams' claim of ineffective assistance therefore fails the first *Strickland* prong.

Moreover, Williams has not shown what further investigation would have

73

revealed, nor has he shown how further investigation would have helped him.  He merely speculates that he would have benefitted from more extensive investigation and interview of the police officers and by obtaining the victim's medical records.  Such speculation, however, does not satisfy Williams' burden.  *See Sayre, Supra.* The record reveals that numerous pre-trial motions for discovery and evidence were filed by the defense.[15]  Furthermore, the record reveals that defense counsel was provided with the reports of the investigating officers through pre-trial open file discovery, and even filed a motion in limine to suppress certain statements in those reports[16], and there is no evidence that the victim's medical records contained any information as to whether the victim did, or did not suffer from osteoporosis.  Even without the medical records, Dr. Trant testified that  that the victim had cirrhosis of the liver.[17]  Williams therefore has not satisfied the second *Strickland* prong.

For these reasons, petitioner is not entitled to relief with respect to this

---

[15]*See* rec. pg. 83-89 (Motion for Discovery and Inspection and Exculpatory Evidence); 90-91 (Motion to Inspect and Copy video tapes, pictures and DVDs); 119-142 (Motion for Discovery, Disclosure and Inspection and for a Bill of Particulars).  Defense counsel additionally filed motions to discover agreement5s and deals between the DA ans any witness for the State and for the criminal records of all State's witnesses. [rec. pg. 153-158].

[16]*See* rec. pg. 110-113 (State's Discovery responses); 144-145 (State's response to Motion for Bill of Particulars).

[17]*See* rec. pg. 1429.

claim.

**Failure to Challenge Juror Qualifications**

Petitioner contends that counsel was ineffective for failing "to object to the process of qualifications of jurors."  He asserts that the defense was not provided with any information that the prospective jurors met the qualifications required by Louisiana law, that is, that each could read, write, speak and understand the English language.  Petitioner claims that he was prejudiced by "the remote possibility that a juror was unable to read, write, speak or even understand the English language" which he contends "place[d] him in jeopardy of one juror relying on the decision-making process of another rendering any verdict suspect and unconstitutional."

The record reveals that *voir dire* of the prospective jurors spanned over a two day period wherein the Court and counsel for the defense and the State thoroughly questioned each potential juror.   During this process, it is clear to the court that each juror was more than capable of understanding the English language.  Thus, there appears to be no basis for an objection by counsel.  Failure to lodge a futile objection does not cause counsel's performance to fall below an objective level of reasonableness.  *See United States v. Preston*, 209 F.3d 783, 785 (5th Cir. 2000) *citing Green*, 160 F.3d at 1037; *Johnson v. Cockrell*, 306 F.3d 249,

255 (5th Cir. 2002).

Petitioner has failed to demonstrate prejudice as a result of counsel's alleged failure to object.  Petitioner merely speculates that a "remote possibility" of prejudice existed which may have changed the outcome of his trial.  However, a mere possibility of a different outcome is insufficient to establish prejudice. *Sayre*, 238 F.3d at 635; *Lamb*, 179 F.3d at 359; *see also Leal v. Dretke*, 2004 WL2603736, *17 (W.D. Tex. 2004) ("absent a showing that any of the twelve persons who actually served as petit jurors in a criminal trial were biased against the defendant or otherwise unqualified to serve in that capacity, a convicted defendant's complaints about alleged deficiencies in the performance of his trial counsel during jury selection do not satisfy the prejudice prong of *Strickland*) *citing Clark v. Collins*, 19 F.3d 959, 965 (5th Cir.1994), *Teague v. Scott*, 60 F.3d 1167, 1172–73 (5th Cir. 1995).  Petitioner is therefore not entitled to relief with respect to this claim.

**Denial of the Right to Testify**

Petitioner alleges that he told his attorney that he wanted to testify to "personally tell the jury what really happened, [and] that he did not kill his wife." However, defense counsel advised that the decision as to whether petitioner could testify was solely in his hands and counsel decided not to allow petitioner to

76

testify in his own defense.[18]   Petitioner claims his attorney's actions prejudiced

him because "the jury was never able to hear his side of what happened . . . ."

A criminal defendant's right to testify is well established, and only the

defendant can waive this right, not his counsel. *United States v. Harris*, 408 F.3d

186, 192 (5th  Cir.2005) *citing United States v. Mullins*, 315 F.3d 449, 452 (5th

Cir. 2002).   Thus, counsel cannot override the ultimate decision of a defendant

who wishes to testify contrary to counsel's advice.  *Bower v. Quarterman,* 497

F.3d 459, 473 (5th Cir. 2007) *citing Mullins*, 315 F.3d at 453.

Nevertheless,  "[a] defendant who argues that his attorney prevented him

from testifying must still satisfy the two prongs of *Strickland*." *Bower,* 497 F.3d at

473 *citing Harris*, 408 F.3d at 192.  "[A]n ineffective assistance contention may be

rejected on an insufficient showing of prejudice, without inquiry into the adequacy

of counsel's performance." *Strickland,* 466 U.S. at 689-94.  Accordingly, the Fifth

Circuit has found claims, like that asserted by petitioner herein, to be meritless in

the absence of a sufficient showing of *Strickland* prejudice.   *United States v.*

---

[18]Petitioner cites a portion of voir dire in support of his claim that counsel failed to allow petitioner to decide if he wanted to testify, wherein defense counsel was attempting to determine if any potential juror would be unable to find for the defense if petitioner did not testify.  In so doing, counsel stated "I'm telling you right now, in a case like this, in a criminal case, you may not get that, okay.  He doesn't have to do that.  More importantly, if he chooses not to do that, usually the decision is made by the attorney as to whether or not, you know, I'll put my client, Mr. Williams, on the stand.  Usually I tell you, I don't think he needs to testify.  Usually, it's my decision, you know." [rec. pg. 599].

*Mullins*, 315 F.3d 449, 456-457 (5th Cir. 2002);  *United States v. Harris*, 408 F.3d

186, 192-193 (5th  Cir.2005).   That is the case here.

In *Mullins,* as in this case, the Fifth Circuit held that the district court did

not clearly err in finding the attorney's actions "objectively unreasonable," but

reversed on application of the second *Strickland* prong, concluding that the

defendant could not show that he was prejudiced by his attorney's failure to call

him as a witness.  *Id*. at 456.  Considering that all or much of Mullins's testimony

was in the record elsewhere, in addition to the potential damage that the

government could elicit on cross-examination, Mullins could not show how his

testimony probably would have changed the outcome of his case. *Id.*

Similarly, in *Harris*, all or much of Harris's proffered testimony was

elsewhere in the record, as a result of defense counsel's questioning of  the defense

sole  witness and the cross-examination of the law enforcement officers.

Furthermore, the fifth Circuit opined that putting Harris on the stand probably

would have done more harm than good, and would have placed him subject to

rigorous potentially damaging cross-examination.  The Fifth Circuit therefore

found that Harris had not shown that he was prejudiced by not testifying.

The same is true in this case.  All or much of petitioner's version of events,

which petitioner presumably would have testified to had he taken the stand,

appears  in the record.   A large portion of  petitioner's own statements about the events surrounding his wife's death was contained in DVDs which were played to the jury during the State's presentation of the case. Although petitioner apparently claims that he would have testified that his wife had been ill and throwing up, and that her injuries were not the result of an intentional act, but rather  petitioner's attempts to assist his wife to and from the bathroom and to resuscitate  her, that evidence was already amply presented to the jury through the DVD excerpts of petitioner's statements to law enforcement officers, and through cross-examination of the law enforcement officers, Dr. Trant and the other lay witnesses presented by the State.   Given the overwhelming evidence of manual strangulation of the victim presented in this case, the Court cannot conceive of anything petitioner could have said, which had not already been presented through alternative sources, that would have provided any reasonable possibility of a different outcome in petitioner's case.

Furthermore, putting petitioner on the stand most probably would have done more harm than good.  Petitioner had repeatedly committed acts of domestic violence on his wife, all of which were well documented by the State.  Had petitioner testified, he would have been subject to extensive cross-examination about those prior incidents, thereby compounding this unfavorable evidence and

79

further inflaming the jury.  Thus, under these circumstances, the Court cannot find

that petitioner's failure to testify unduly prejudiced his case.

In sum, petitioner has not demonstrated that had he testified, the result of his

criminal trial would have been different, or stated differently, that his testimony

would have made a different outcome reasonably probable.  *See Mullins,* 315 F.3d

at 456 *citing Sayre, supra.* (finding that *Strickland*'s prejudice element, "which

raises high the bar to relief",  not satisfied because while the petitioner's testimony

*might* have persuaded the jury, the court could not say that there was a reasonable

probability that his testimony would have done so).  In essence, whether petitioner

testified or not, the jury heard his side of the story and was simply not persuaded.

Accordingly, petitioner has not satisfied the second  *Strickland* requirement and is

therefore not entitled to relief with respect to this claim.

**Failure to Challenge Arrest Warrant Affidavit**

Petitioner alleges that counsel was ineffective for failing to challenge the

affidavit in support of his February 20, 2006  arrest warrant charging him with

domestic abuse battery which he claims was lacking in probable cause.  He further

asserts that had counsel done so that statements which the State played to the jury

would have been suppressed.

The record reflects that defense counsel did, in fact, move to suppress the

statements made to law enforcement following his February 20, 2006 arrest on various grounds, including that he was arrested without probable cause, thereby rendering the statements the fruit of his illegal arrest. [rec. pg. 114-118]. The State filed Opposition arguing, amongst other reasons for admission of the statements, that probable cause for the arrest existed as evidenced by the findings of the officers at the scene, noting that at petitioner's forty-eight hour hearing, Judge Porter likewise found probable cause to exist after review of the affidavit for arrest, which the State attached to its Opposition. [rec. pg. 149-152A].

An evidentiary hearing on the Motion, and other defense motions, was held on June 25, 2008, after which the Court requested post-hearing memoranda. [rec. pg. 11-13]. On July 7, 2008, after the State filed its post-trial memorandum and the defense counsel filed additional motions and memorandums, the Court advised that a ruling on all outstanding motions would be placed on the record at trial which was at that time set for July 11, 2008. [rec. pg. 14]. On July 14, 2008, the Court ruled certain portions of the DVDs containing statements and other crimes evidence were admissible and other portions were not, thereby effectively denying the defendant's Motion to Suppress. [rec. pg. 15].

Under these circumstances, counsel was not deficient and petitioner suffered no prejudice as a result of counsel's alleged actions. This claim is

therefore without merit.

## Failure to Request Racial Prejudice *Voir Dire*

Next petitioner alleges that counsel was ineffective for failing to have the trial court question the prospective jurors on the issue of racial bias since the crime was interracial.   Petitioner claims this failure caused "an unacceptable risk of racial prejudice."

Initially, the Court notes that defense counsel did ask the jurors in the second panel, from which six jurors were selected, their views on interracial marriage and additionally asked the third panel from which the alternate juror was selected,  on this issue as well. [rec. pg. 869-883; 1057-1059].  However, several pages of defense counsel's voir dire of the first panel, from which six jurors were selected are missing.[19]  Accordingly, out of an abundance of caution, this claim will be briefly addressed.

 Questions of racial prejudice are not required simply because victim and defendant are different races.  *Ristaino v. Ross*, 424 U.S. 589, 596, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976).  In this case, there is no indication in the entire record that any racial overtones were involved in this case or that the trial occurred in a racially charged atmosphere, nor is there any suggestion that the crime was in

---

[19]rec. pgs. 633-666 are missing.

any way racially motivated.  Thus, there is no basis or this Court to find counsel's performance deficient.

Furthermore, petitioner has failed to demonstrate *Stickland* prejudice.  In order to sustain a claim of ineffective assistance of counsel based on inadequacies of voir dire, a habeas petitioner must demonstrate that at least one of the challenged jurors was actually biased against him.  *Bell v. Epps,* 2008 WL 2690311, *26 (N.D. Miss. 2008) *citing Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001), *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995).  In the absence of such a showing, a petitioner cannot demonstrate that he was denied his Sixth Amendment right to a fair and impartial jury. *Id. citing  Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982) (prospective jurors presumed impartial; challenger bears burden of proving actual bias to maintain claim that juror prejudiced him).

Petitioner has made no allegation that any seated member of the jury was actually tainted by racial bias.  Other than by conclusorily stating that the failure caused "an unacceptable risk of racial prejudice", petitioner has failed to allege or explain how counsel's race neutral approach during voir dire prejudiced his case. Accordingly, petitioner has not satisfied his burden under *Strickland* "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." See *Clark v. Collins*, 19 F.3d 959, 965 (5th Cir.1994) (petitioner who failed to demonstrate that impaneled jury was tainted by racial bias failed to demonstrate prejudice for purposes of ineffective assistance of counsel claim); *Moore v. Butler*, 819 F.2d 517, 520-521 (5th Cir. 1987) (failure to allege or explain how counsel's "colorblind" approach during voir dire prejudiced his case, other than by pointing out a local history of racial discrimination, an interracial crime and that he was tried by an all-white jury "did "not come close" to satisfying Strickland's prejudice element);  *Teague v. Scott*, 60 F.3d 1167, 1172-73 (5th Cir. 1995) (holding that complaints about trial counsel's performance at voir dire failed to satisfy the prejudice prong of Strickland absent specific factual allegations showing that any biased venire members actually served on the jury).

For these reasons, petitioner has not shown that he is entitled to relief on this claim.

## **CONCLUSION**

For the reasons set forth above;

**IT IS RECOMMENDED** that this petition for *habeas corpus* should be **DENIED AND DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b),

parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A  party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.  1996).

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28

U.S.C. §  2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

Signed at Lafayette, Louisiana this 19th day of April, 2016.

_____

**PATRICK J. HANNA**
**UNITED STATES MAGISTRATE JUDGE**

86